UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

---

ROBERT THAYER, SHARON BROWNSON,
and TRACY NOVICK,

        Plaintiffs,

    v.

CITY OF WORCESTER,

        Defendant.

Civil Action No. 13-40057

## **COMPLAINT**

Kevin P. Martin (BBO# 655222)
Yvonne W. Chan (BBO# 669223)
Todd Marabella (BBO# 682525)
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
Tel.: 617.570.1000
Fax.: 617.523.1231
KMartin@goodwinprocter.com
YChan@goodwinprocter.com
TMarabella@goodwinprocter.com

Matthew R. Segal (BBO# 654489)
Sarah R. Wunsch (BBO# 548767)
American Civil Liberties Union
  of Massachusetts
211 Congress Street
Boston, Massachusetts 02110
Tel.: 617.482.3170
Fax.: 617.451.0009
MSegal@aclum.org
SWunsch@aclum.org

*Attorneys for Plaintiffs*

Plaintiffs Robert Thayer, Sharon Brownson, and Tracy Novick (collectively, "Plaintiffs"), by and through their attorneys, hereby allege as follows:

**<u>INTRODUCTION</u>**

1.      This is an action brought under 42 U.S.C. §1983, the First and Fourteenth Amendments to the United States Constitution, the Massachusetts Civil Rights Act (G.L. c. 12, § 11I), and the Massachusetts Declaration of Rights, for declaratory and injunctive relief against the City of Worcester (the "City"), arising out of the City's recent adoption of two anti-"panhandling" ordinances, R.O. c. 9, § 16 and R.O. c. 13, § 77(a).  The City adopted these ordinances in January 2013 as part of an attempt to reduce "panhandling"—the solicitation of donations by the homeless—within Worcester, and purportedly to address concerns about undue coercion and fear resulting from such activities by the homeless.  Although framed as an effort to address "aggressive" solicitation and protect public safety, the ordinances prohibit a significant amount of peaceful, non-threatening, and non-aggressive speech, and hence are overbroad and facially unconstitutional.

2.      The first ordinance, Section 16 in Chapter 9 of the Worcester Revised Ordinances, makes it "unlawful for any person to beg, panhandle or solicit any other person in an aggressive manner."  R.O. c. 9, § 16(c).  The ordinance defines "aggressive manner" to encompass and prohibit a broad range of peaceful conduct, including soliciting from anyone who is waiting in line for any purpose; "following" the person being solicited with the intent of asking that person for money; and "unreasonably" causing a pedestrian or vehicle "to take evasive action to avoid physical contact."  *Id.*  Solicitation is also prohibited under the ordinance if it occurs within 20 feet of a number of locations, including the entrances to mass transportation facilities or stops, public restrooms, banks, pay telephones, outdoor cafes, and any place of public assembly.  *Id.*

Moreover, the ordinance prohibits any type of solicitation that occurs "after dark," which is defined as "the time from one-half hour before sunset to one-half hour after sunrise," a period that begins as early as 3:45 p.m. in the winter. *Id.*

3.      The second ordinance, Section 77(a) of Chapter 13, prohibits "walking or standing on any traffic island or upon the roadway of any street or highway."  "Traffic island" is defined as "any area or space within a roadway which is set aside by the use of materials or paint for the purpose of separating or controlling the flow of traffic and which is not constructed or intended for use by vehicular traffic or by pedestrians" (R.O. c. 13, § 1)—in other words, places like rotaries and traffic medians that are commonly used by a number of individuals and organizations, such as politicians, as a forum for public speech.

4.      Plaintiffs are individuals who regularly solicit donations or engage in political and other protected speech in Worcester.  In adopting the two anti-"panhandling" ordinances, the City has significantly restricted Plaintiffs' constitutionally protected speech, in violation of the First and Fourteenth Amendments to the United States Constitution and Articles I and XVI of the Massachusetts Declaration of Rights.  The City has also impermissibly targeted the poor and the homeless, in violation of the Equal Protection Clause of the Fourteenth Amendment.

5.      Rather than narrowly tailoring the ordinances to the stated goal of protecting public safety, the City has instead chosen to proscribe a wide range of peaceful and constitutionally-protected expression, none of which implicates any safety concerns.  Under the City's new ordinances, nonprofit organizations are now prohibited from asking passersby for donations at any time beginning half an hour before sunset.  Groups that sell goods to raise money for charity must also stop their activities half an hour before sunset, and cannot solicit sales from anyone who happens to be waiting in line, or anyone who is within 20 feet of an

outdoor cafe, even in broad daylight.  Individuals like Plaintiffs Robert Thayer and Sharon Brownson who depend on assistance from strangers for basic necessities like food and shelter now risk arrest if they stand peacefully and quietly on a sidewalk with a sign that says, "Please Help," if there is a public restroom, bus stop, or payphone within 20 feet, or if they step into stopped traffic to receive a proffered donation.  Local politicians like Plaintiff Tracy Novick are now prohibited from campaigning on traffic islands and rotaries that have traditionally been used for political speech.

6.      In addition, the City's new ordinances are unconstitutionally vague, prohibiting such undefined conduct as "unreasonably" causing another individual to take "evasive action," R.O. c. 9, § 16(c), or standing on a traffic island not "intended" for foot traffic.  Not only do the ordinances fail to give sufficient notice as to the specific conduct that is proscribed, they also encourage arbitrary enforcement by giving police a substantial amount of discretion in determining whether there has been a violation.  In fact, the City has already signaled its intent to selectively enforce the new ordinances by specifically targeting homeless persons soliciting donations, while allowing others to violate the ordinances without any repercussions.

7.      Plaintiffs seek a judgment under 42 U.S.C. § 1983, 28 U.S.C. § 2201, and G.L. c. 12, § 11I, that the two ordinances, R.O. c. 9, § 16 and R.O. c. 13, § 77(a), and the City's discriminatory enforcement policy, are unconstitutional violations of Plaintiffs' rights to freedom of speech and equal protection under the First and Fourteenth Amendments to the United States Constitution and Articles I and XVI of the Massachusetts Declaration of Rights.  Plaintiffs also seek preliminary and permanent injunctive relief in the form of an order enjoining the City from applying or enforcing these two ordinances.

## THE PARTIES

8.       Plaintiff Robert Thayer is a resident of Worcester.

9.       Plaintiff Sharon Brownson is a resident of Worcester.

10.      Plaintiff Tracy Novick is a resident of Worcester and an elected member of the Worcester School Committee.

11.      The Defendant City of Worcester (the "City") is a municipal corporation incorporated under the laws of Massachusetts.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1988, as this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. The Court also has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. § 2201. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

13.      This Court has personal jurisdiction over the City because it is a resident of Massachusetts.

14.      Venue in this district is proper under 28 U.S.C. § 1391(b)(1) and (2) because the City of Worcester is located within this district, and a substantial part of the events or omissions giving rise to the claim occurred within this district.

## FACTS

### The Challenged Ordinances

15.      In the summer of 2012, faced with a perceived problem concerning the volume of solicitation by the homeless in Worcester, the Worcester City Council asked the City Manager, Michael V. O'Brien, to present a strategy to reduce "panhandling" throughout Worcester.

16.     This was not the first time the City had tried to eliminate "panhandling."  In 2005, the City had adopted an "interagency collaborative and action plan to reduce the incidence of panhandling and related concerns in the City of Worcester."  April 12, 2005 Letter from Michael V. O'Brien to Worcester City Council, attached hereto as Exhibit 1, at 1.  As part of this campaign, the City placed signs and billboards around Worcester, and organized a citywide distribution of a brochure declaring that "Panhandling is not the Solution!":



*See id.*

17.     By all accounts, the 2005 campaign was not successful to the degree the City desired, and the City received a considerable amount of criticism from community groups and leaders for its decision to target the poor and the homeless.  The anti-panhandling signs and billboards that had been placed around Worcester were removed in 2006, after much protest and debate.

18.     The failure of the 2005 campaign, however, did not end the matter.  In 2012, the City Council once again asked Mr. O'Brien for strategies to reduce or eliminate "panhandling."

19.     On July 17, 2012, Mr. O'Brien responded to the City Council's request with a

number of recommendations, including a targeted outreach program to compile data concerning panhandling and a public education campaign to—once again—discourage donations to panhandlers. *See* July 17, 2012 Letter from Michael V. O'Brien to Worcester City Council, attached hereto as Exhibit 2.

20. In his response, Mr. O'Brien also explained to the City Council that "panhandling" is constitutionally protected speech:

> Panhandling—or approaching pedestrians or drivers to beg for money or food—may be classified as either passive or aggressive. Passive panhandling is defined as "soliciting without threat or menace, often without any word exchanged, while aggressive panhandling is defined as soliciting coercively, with actual or implied threats, or menacing actions."
>
> Peaceful panhandling is constitutionally protected speech under the First Amendment to the U.S. Constitution. In 1997, the Massachusetts Supreme Judicial Court held that State statute G.L. c. 272, § 66, prohibiting persons from "wandering about and begging . . . in public or private ways . . . or in other places," violated the First Amendment. *Benefit v. Cambridge*, 424 Mass. 918, 923 (1997).
>
> The Court concluded that ". . . *(a) the peaceful begging engaged in by the plaintiff involves communicative activity protected by the First Amendment; (b) the criminal sanction, imposed on that activity by G.L. c. 272, 66 is content- and viewpoint-based and bans the activity in traditional public forums; and (c) as a result, the statute is subject to strict scrutiny, a test which it cannot pass . . .*"

Exhibit 2, at 3.

21. Mr. O'Brien acknowledged that there are state laws, such as laws against trespassing, assault and battery, and disorderly conduct, that can be enforced against "aggressive panhandling." *Id.* Nonetheless, on October 30, 2012, Mr. O'Brien presented to the City Council two proposed ordinances "aimed at reducing the incidence of panhandling in our community."

Oct. 30, 2012 Letter from Michael V. O'Brien to Worcester City Council, attached hereto as Exhibit 3, at 1.

22.     These proposed ordinances were the subject of much public discussion and debate.  A particular concern that was repeatedly expressed was the potential impact of the proposed ordinances on so-called "Tag Days."  Prior to the adoption of the ordinances, non-profit groups and organizations could apply to the City for permits allowing them to solicit donations on sidewalks and traffic islands on a particular day.  The only restrictions on "Tag Day" activities were that all participants had to be at least sixteen years of age, and that participants could conduct solicitations "only from sidewalks or traffic islands and shall not stand upon any traveled portion of any public way except to receive a contribution offered by a motorist."  *See* Sample Tag Day Permit, attached hereto as Exhibit 4.  Groups that have applied for and received "Tag Day" permits in the past include high schools, Little League teams, churches, and firefighters soliciting for the Muscular Dystrophy Association (the "Fill-the-Boot" drive).

23.     "Tag Day" fundraising efforts have taken place in Worcester for decades, and are highly valued by groups that have come to rely on "Tag Days" to raise money for their causes.  There is no evidence that soliciting from motorists in connection with Tag Days has ever resulted in any accidents or harm in Worcester.  In fact, both the Worcester Police Chief, Gary Gemme, and Fire Lieutenant John Franco have stated that they do not recall any injuries or accidents from "Tag Day" activities.  *See* Exhibit 5.  And when the City had adopted its anti-"panhandling" public education campaign in 2005, the report submitted by the City Manager had made it a point to note that "tag days" would not be affected.  *See* Exhibit 1.

24.     The concern about the potential effect of the proposed ordinances on "Tag Days" was so great that the City Council requested that the City Solicitor, David Moore, provide a legal opinion about the constitutionality of allowing an exemption under the ordinances for "Tag Days."  In other words, the City Council asked whether the Constitution would allow it to ban the poor and the homeless from soliciting on roadways and traffic islands, while allowing firefighters, students, and other groups to continue doing the same.

25.     In response to the City Council's request, Mr. Moore wrote: "Allowing tag day solicitations while banning other solicitations would create a distinction based on the content or the nature of the speaker.  This distinction would not survive scrutiny under the Constitution." *See* Nov. 7, 2012 Letter from David M. Moore to Michael V. O'Brien, attached hereto as Exhibit 6.

26.     The proposed ordinances were also discussed at a number of City Council meetings, and the City Council, expressing some concerns about whether to adopt the ordinances, sent them to committee for further discussion.  At a joint committee meeting held on January 3, 2013, members of the Worcester community expressed concern that the ordinances would restrict speech by preventing individuals either from asking for help or from fulfilling their religious obligations to help those in need.  City Councilors also expressed concern about the impact on political speech, noting the potential application of the ordinances to political candidates campaigning in Newton Square, a rotary in Worcester that is often used for political campaigns and other public speech.  Other individuals, including business owners, argued in favor of the ordinances because of their belief that panhandling was bad for business and for the City's image in general.

27.     At the January 3 meeting, in response to a question about whether political

candidates could continue to campaign on traffic medians and rotaries such as Newton Square, the City Solicitor stated that there was an "element of discretion" in the ordinances and that police would not issue a warning to someone on Newton Square unless the police believed that there was a public safety issue.

28.      On or about January 29, 2013, after several months of debate and despite objections from several City Councilors and other members of the community, the City Council passed the two ordinances. Two City Councilors voted against the ordinances.

29.      In adopting the first ordinance, R.O. c. 9, § 16 (attached hereto as Exhibit 7), the City Council found that "[p]ersons approached by individuals asking for money, objects or other things of any value are particularly vulnerable to real, apparent or perceived coercion when such request is accompanied by or immediately followed or preceded with aggressive behavior." R.O. c. 9, § 16(a)(3). Accordingly, the City stated its intent to "protect . . . the people and/or property of those who chose to be non-participating." *Id.* §16(b). While the City also stated its intent to "protect the rights of all peoples to exercise their First Amendment rights" (*id.*), the ordinance that the City chose to adopt, however, restricts a significant amount of speech that is protected under the First Amendment.

30.      Section 16 prohibits the following:

> It shall be unlawful for any person to beg, panhandle or solicit any other person in an aggressive manner. Any police observing any person violating this provision may request or order such person to cease and desist in such behavior and may arrest such person if they fail to comply with such request or order.

R.O. c. 9, § 16(d). "Beg," "begging," or "panhandling," are defined to mean "asking for money or objects of value, with the intention that the money or object be transferred at that time, and at that place." *Id.* § 16(c). "Solicit" or "soliciting" are defined as "using the spoken, written, or printed word, bodily gestures, signs, or other means of communication with the purpose of

9

obtaining an immediate donation of money or other thing of value the same as begging or panhandling and also include the offer to immediately exchange and/or sell any goods or services." *Id.*

31. The ordinance defines "aggressive manner" broadly to encompass, *inter alia*, the following conduct:

> (2) continuing to solicit from a person after the person has given a negative response to such soliciting;
>
> * * *
>
> (4) intentionally blocking or interfering with the safe or free passage of a pedestrian or vehicle by any means, including unreasonably causing a pedestrian or vehicle operator to take evasive action to avoid physical contact;
>
> * * *
>
> (6) following the person being solicited, with the intent of asking that person for money or other things of value;
>
> (7) soliciting money from anyone who is waiting in line for tickets, for entry to a building or for any other purpose;
>
> * * *
>
> (10) soliciting any person within 20 feet of the entrance to, or parking area of, any bank, automated teller machine, automated teller machine facility, check cashing business, mass transportation facility, mass transportation stop, public restroom, pay telephone or theatre or place of public assembly, or of any outdoor seating area of any cafe, restaurant or other business;
>
> (11) soliciting any person in public after dark, which shall mean the time from one-half hour before sunset to one-half hour after sunrise.

R.O. c. 9, § 16(c).

32.     The second ordinance, R.O. c. 13, § 77(a), prohibits walking or standing in certain areas, in particular, on roadways and traffic islands:

> No person shall, after having been given due notice warning by a police officer, persist in walking or standing on any traffic island or upon the roadway of any street or highway, except for the purpose of crossing the roadway at an intersection or designated crosswalk or for the purpose of entering or exiting a vehicle at the curb or for some lawful purpose. Any police officer observing any person violating this provision may request or order such person the [sic] remove themselves from such roadway or traffic island and may arrest such person if they fail to comply with such request or order.

G.L. c. 13, § 77(a) (attached hereto as Exhibit 8). "Traffic island" is defined as "any area or space within a roadway which is set aside by the use of materials or paint for the purpose of separating or controlling the flow of traffic and which is not constructed or intended for use by vehicular traffic or by pedestrians, unless such area or space is marked or otherwise designated as a crosswalk." G.L. c. 13, § 1.

### Enforcement of the Ordinances

33.     The two ordinances took effect on January 30, 2013. Immediately thereafter, the Worcester Police Chief stated his intent to "immediately enforce against aggressive panhandling."

34.     For the first few weeks after the ordinances took effect, the Worcester Police Department (the "Police Department") issued warnings and handed out informational cards to the homeless with the following message:



*See* Exhibit 9.  As an initial matter, these warnings are misleadingly overbroad.  R.O. 13, § 77(a) prohibits walking or standing "on any traffic island or upon the roadway," but these warnings assert that panhandling merely "at" a roadway—for example, on a sidewalk adjacent to a roadway—is also prohibited.

35.     Moreover, as evidenced by these cards, the City and the Police Department's enforcement of the ordinances is focused on "panhandling" by the homeless, and not on other speech or conduct that may take place on roadways, rotaries, or traffic medians and islands.

36.     The City also distributed the following flyer to other members of the public, misleadingly telling the public that *offering a donation* to a solicitor "at" a roadway was now prohibited under Section 77(a):

City of Worcester Pedestrian Safety Ordinance

EFFECTIVE IMMEDIATELY

Offering money to someone standing in a roadway or on a median puts them and other drivers directly in danger. To ensure pedestrian safety this activity is prohibited at or in the following areas:

- Roadways
- Rotaries
- Traffic medians/islands

Exhibit 10.

37.     During a recent protest in which several individuals stood on a traffic median in Lincoln Square, in clear violation of R.O. c. 13, § 77(a), the police declined to make any arrests, let alone issue a warning.

38.     Since then, however, the Police Department has arrested several homeless individuals for soliciting donations in violation of the ordinances.

## The Plaintiffs

39.     Plaintiff Robert Thayer is a resident of Worcester who has been homeless for approximately three years.  Mr. Thayer regularly stands on sidewalks in Worcester, next to roadways, with signs that contain messages asking passersby for help or money.  Mr. Thayer does not approach or touch any vehicles that pass by him unless the driver or passenger of the vehicle gestures or indicates to him that they wish to make a donation.  Mr. Thayer only steps into a roadway when cars are stopped at a traffic light, and only for the purpose of receiving a proffered donation.  Mr. Thayer relies on the donations that he receives to purchase basic necessities such as food.  Since the ordinances were adopted, Mr. Thayer has been told by Worcester police officers that he is not permitted to "panhandle" on the sidewalk next to a roadway.

40.     Plaintiff Sharon Brownson is a resident of Worcester who has been homeless for approximately three years.  Ms. Brownson regularly stands on sidewalks in Worcester, next to roadways, with signs that contain messages asking passersby for help or money.  Ms. Brownson does not approach or touch any vehicles that pass by her unless the driver or passenger of the vehicle gestures or indicates to her that they wish to make a donation.  Ms. Brownson only steps into a roadway when cars are stopped at a traffic light, and only for the purpose of receiving a

proffered donation.  Ms. Brownson relies on the donations that she receives to purchase basic necessities such as food.  Since the ordinances were adopted, Ms. Brownson has been told by Worcester police officers that she is not permitted to "panhandle" on the sidewalk next to a roadway.

41.     Plaintiff Tracy Novick has been a member of the Worcester School Committee since 2009.  During the 2009 and 2011 elections, she regularly campaigned on traffic islands and rotaries throughout Worcester, along with many other local politicians, including members of the City Council.  Ms. Novick intends to run for re-election in the fall of 2013.

## The Ordinances Are Unconstitutionally Overbroad

42.     The United States Supreme Court "has characterized the freedom of speech and that of the press as fundamental personal rights and liberties.  The phrase is not an empty one and [is] not lightly used."  *Schneider v. New Jersey*, 308 U.S. 147, 161 (1939) (footnote omitted).  "It has become axiomatic that '[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms.'"  *United States v. Robel*, 389 U.S. 258, 265 (1967) (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)).

43.     Accordingly, "when statutes regulate or proscribe speech and when 'no readily apparent construction suggests itself as a vehicle for rehabilitating the statutes in a single prosecution,' . . . the transcendent value to all society of constitutionally protected expression is deemed to justify allowing 'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity."  *Gooding v. Wilson*, 405 U.S. 518, 520-21 (1972).

44.     The overbreadth doctrine "is predicated on the sensitive nature of protected expression."  *New York v. Ferber*, 458 U.S. 747, 768 (1972).  The doctrine "is deemed necessary

because persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression." *Gooding v. Wilson*, 405 U.S. 518, 521 (1972).

45. Here, both of the City's newly-adopted ordinances are, on their face, overly broad and unconstitutionally infringe Plaintiffs' rights to freedom of speech and expression by restricting a substantial volume of peaceful, non-threatening, and constitutionally protected speech.

46. For example, R.O. c. 9, § 16 prohibits all solicitation at any time after sunset, and for half an hour before sunset. In Worcester in the winter, the period from half an hour before sunset to half an hour after sunrise can last up to sixteen hours per day, and can begin as early as 3:45p.m. Moreover, the restriction applies even in crowded and well-lit areas, such as downtown Worcester near the DCU Center or near the many shops, restaurants, and nightclubs on Main Street. There is no reason why such a broad temporal restriction on solicitation of donations is necessary to address whatever legitimate concerns exist about truly "aggressive" panhandling.

47. Likewise, R.O. c. 9, § 16 creates countless no-solicitation zones throughout Worcester by prohibiting solicitation within 20 feet of the entrances or parking areas of theatres, banks, public restrooms, bus stops, and pay telephones, and within 20 feet of any outdoor cafes or restaurants or other outdoor seating areas. The ordinance prohibits a homeless person from sitting quietly on a sidewalk, ten feet away from a pay telephone or a bus stop, with a sign that says "Homeless – Please Help," conduct that could not possibly be construed as threatening to anyone.

48. Similarly, R.O. c. 13, § 77(a) prohibits Plaintiffs from engaging in *any* type of speech on a traffic island or roadway. Thus, individuals, including local politicians such as

Plaintiff Tracy Novick, can no longer stand on the rotary in Newton Square—as they have done without incident for years—holding signs that contain core First Amendment speech. Likewise, individuals such as Plaintiff Robert Thayer can no longer stand on the sidewalk, holding a sign asking for help from motorists stopped at a traffic light, conduct that is clearly not aggressive or dangerous:



49.     Plaintiffs are prohibited under both ordinances from engaging in any of the activities described above, even though each of these activities is peaceful and non-intrusive, and does not threaten the safety of any individual or the public peace.

50.     Because the ordinances restrict such a substantial amount of constitutionally protected speech, they cannot survive review under the First and Fourteenth Amendments to the United States Constitution and Article XVI of the Massachusetts Declaration of Rights.

**The Ordinances Are Unconstitutionally Vague**

51.     "It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it

prohibits." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). In particular, "where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.'" *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (footnote omitted).

52.     In the First Amendment context, "[t]he prohibition against vague regulations of speech is based in part on the need to eliminate the impermissible risk of discriminatory enforcement . . . The question is not whether discriminatory enforcement occurred here, . . . but whether the Rule is so imprecise that discriminatory enforcement is a real possibility." *Gentile v. State Bar of Nev.*, 501 US 1030, 1051 (1991) (citing *Kolender v. Lawson*, 461 U. S. 352, 357-358, 361 (1983)).

53.     Here, the two ordinances are unconstitutionally vague, as they fail to define the prohibited conduct with adequate specificity, creating a significant risk of discriminatory enforcement. Indeed, the City has repeatedly indicated an intent to enforce the laws in a discriminatory manner.

54.     For example, R.O. c. 9, § 16 prohibits "continuing to solicit from a person after the person has given a negative response to such soliciting." However, the ordinance defines "solicit" to include "using the . . . written, or printed word . . . [and] signs," and it is unclear whether it requires an individual to stop displaying a sign once a passerby has given a "negative response."

55.     Similarly, R.O. c. 13, §§ 1 and 77(a) defines traffic islands to include only those areas or spaces that are "not constructed or intended for use" by vehicles or pedestrians, without explaining how to determine the intent behind the construction of a particular space.

56.     Because the ordinances fail to define the prohibited conduct with adequate

specificity, Plaintiffs are left without sufficient notice as to what constitutes a violation of the statute. For example, the ordinances fail to give any guidance as to whether a charitable organization's employees or volunteers are in violation of R.O. c. 9, § 16 if they are standing on a sidewalk and allowing some room for others to pass, but an individual who happens to be approaching them directly would need to take a few steps to one side in order to avoid physical contact. Similarly, R.O. c. 13, § 77(a) fails to explain whether traffic islands or medians that are paved in the same manner as sidewalks in Worcester are "constructed or intended for use by . . . pedestrians," particularly where such islands or medians are adjacent to, or surrounding, a crosswalk, as many are in Worcester:



Accordingly, local politicians like Plaintiff Tracy Novick are left without any guidance as to whether they are permitted to engage in political speech in these public fora.

57.  Further, both the vague language and the enforcement provisions of the ordinances allow the police significant discretion in determining whether there has been a violation of either ordinance. For example, because terms such as "unreasonably" causing "evasive action" are not defined in the ordinances, and it is often unclear whether a traffic island is "intended" or "constructed" for pedestrians to stand on, the police have wide discretion in

deciding whether to issue a cease and desist order. There is nothing in the ordinance that prevents an individual police officer from deciding, for example, that any passerby who needs to step to one side to avoid someone who is soliciting on a sidewalk has been "unreasonably" forced to take "evasive action."

58. Moreover, both ordinances provide that police may make an arrest only after an individual has failed to comply with a request or order to cease their conduct. Accordingly, not only do the police have discretion in determining whether to make an arrest, police discretion in deciding when to issue such a request or order also determines whether there has been a violation of the ordinances in the first place.

59. All told, because they are so vague, these ordinances infringe Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution and Articles I and XVI of the Massachusetts Declaration of Rights.

**The Ordinances And Defendants' Enforcement Policy Discriminate Against the Poor**

60. Discriminatory enforcement of the ordinances is not just a hypothetical possibility. In fact, the City and its Police Department have already made clear that the ordinances are targeted at and will be selectively enforced only against certain individuals— namely, the poor and the homeless.

61. To begin with, the impetus behind the ordinances was the City Council's desire to reduce begging by the poor and the homeless in Worcester. As discussed above, the City Council had asked the City Manager to recommend strategies for reducing panhandling, and the City Manager had proposed, among other things, the adoption of these two ordinances. Further, much of the concern surrounding the adoption of these ordinances was the effect that they would have on the ability of schools, churches, and other non-profit organizations—in other words,

everyone other than the homeless and the poor—to solicit donations from the public. The City Council even asked the City Solicitor to advise on whether it would be constitutional to create an exemption for groups like schools, churches, and firefighters to continue their "Tag Day" fundraising activities, while prohibiting "panhandling" by the homeless in the same locations.

62.     Although the City Solicitor advised that such a content-based restriction would be unconstitutional, the City and its Police Department have signaled that the ordinances will be enforced only against the poor and the homeless who solicit for donations, and not against others.

63.     For example, in response to a concern raised at the joint committee meeting in January 2013 about the application of the ordinances to political candidates who stand on traffic islands or rotaries, the City Solicitor noted that there was an "element of discretion" in the ordinances and that police would only enforce the ordinances if there was a "public safety issue"—thus implying that the ordinances would not in fact be enforced against politicians.

64.     Statements by members of the City Council have also made clear that the purpose of the two ordinances is to reduce solicitation by the homeless. City Councilor William Eddy recently stated that he believes the ordinances are working because he sees fewer homeless persons soliciting money on his way to work. *See Worcester starts enforcing new panhandling rules*, Boston Herald, Mar. 20, 2013, *available at* http://bostonherald.com/news_opinion/ local_coverage/2013/03/worcester_starts_enforcing_new_panhandling_rules, attached hereto as Exhibit 11.

65.     The Police Department has also indicated that police enforcement efforts will be targeted at the homeless. The Chief of Police has indicated to the press his belief that many homeless are soliciting money for drugs, not for food. *See* Scott J. Croteau, *Worcester police*

*start arresting panhandlers*, Worcester Telegram & Gazette, Mar. 20, 2013, *available at* http://www.telegram.com/article/20130320/NEWS/103209932/0/SEARCH, attached hereto as Exhibit 12.  The Police Department also handed out misleading notices to and about the homeless, but there is no evidence of an informational campaign directed at other groups.

66.     Indeed, although the Police Department refused to arrest individuals who stood on a traffic median in a recent protest against the ordinances, the Police Department subsequently arrested several homeless individuals for soliciting donations on medians and roadways.

67.     By adopting ordinances aimed at the poor and the homeless, and by selectively enforcing the ordinances only against that class of individuals, the City has violated Plaintiffs' rights to freedom of speech and equal protection under the First and Fourteenth Amendments to the United States Constitution and Articles I and XVI of the Massachusetts Declaration of Rights.

## CLAIMS FOR RELIEF

### Count I
### Violation of 42 U.S.C. § 1983 (R.O. c. 9, § 16)

68.     Plaintiffs hereby re-allege Paragraphs 1 through 67 as though fully set forth herein.

69.     42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1988 allows the court to award attorney's fees and costs to the prevailing party in an action brought under Section 1983.

70.     The First Amendment to the United States Constitution, as applicable to the States through the Fourteenth Amendment, prohibits the making of any law that "abridg[es] the freedom of speech."  The Fourteenth Amendment also guarantees due process and prohibits States from denying to any person "the equal protection of the laws."

71.     As described above, R.O. c. 9, § 16, on its face, unconstitutionally infringes or imminently threatens to infringe Plaintiffs' rights under the First and Fourteenth Amendments, including their rights to freedom of speech and expression, and their rights to due process and equal protection under the law.

72.     The City and its Police Department's policy of enforcing R.O. c. 9, § 16 also unconstitutionally infringes or imminently threatens to infringe Plaintiffs' rights under the First and Fourteenth Amendments, including their rights to freedom of speech and expression, and their rights to due process and equal protection under the law.

73.     By acting and threatening to act under the color of state law to deprive Plaintiffs of rights guaranteed by the Constitution and laws of the United States, the City and its Police Department have violated and continue to violate 42 U.S.C. § 1983.

74.     As a result, Plaintiffs are entitled to preliminary and permanent injunctive relief, a declaratory judgment, costs and attorney's fees, and such other relief as the Court deems just.

**Count II**
**Violation of 42 U.S.C. § 1983 (R.O. c. 13, § 77(a))**

75.     Plaintiffs hereby re-allege Paragraphs 1 through 74 as though fully set forth herein.

76.     As described above, R.O. c. 13, § 77(a), on its face, unconstitutionally infringes or imminently threatens to infringe Plaintiffs' rights under the First and Fourteenth Amendments,

including their rights to freedom of speech and expression, and their rights to due process and equal protection under the law.

77.　　The City and its Police Department's policy of enforcing R.O. c. 13, § 77(a) also unconstitutionally infringes or imminently threatens to infringe Plaintiffs' rights under the First and Fourteenth Amendments, including their rights to freedom of speech and expression, and their rights to due process and equal protection under the law.

78.　　By acting and threatening to act under the color of state law to deprive Plaintiffs of rights guaranteed by the Constitution and laws of the United States, the City and its Police Department have violated and continue to violate 42 U.S.C. § 1983.

79.　　As a result, Plaintiffs are entitled to preliminary and permanent injunctive relief, a declaratory judgment, costs and attorney's fees, and such other relief as the Court deems just.

**Count III**
**Massachusetts Civil Rights Act, G.L. c. 12, § 11I  (R.O. c. 9, § 16)**

80.　　Plaintiffs hereby re-allege Paragraphs 1 through 79 as though fully set forth herein.

81.　　The Massachusetts Civil Rights Act, G.L. c. 12, § 11I, provides that "[a]ny person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages." Section 11H makes it illegal to "interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured

by the constitution or laws of the commonwealth."  Section 11I also provides for an award of litigation costs and attorneys' fees for any aggrieved persons who prevail in an action under this section.

82.     Article I of the Massachusetts Declaration of Rights states that "[a]ll people are born free and equal and have certain natural, essential and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety and happiness."  Article XVI states, unequivocally, that "[t]he right of free speech shall not be abridged."

83.     As described above, by enacting R.O. c. 9, § 16 and issuing notices to the public aimed at deterring peaceful solicitation, and through their policy of enforcing R.O. c. 9, § 16, the City and its Police Department are interfering by means of threats, intimidation, and coercion, with Plaintiffs' rights to freedom of speech, due process, and equal protection as secured by Articles I and XVI of the Massachusetts Declaration of Rights, and the First and Fourteenth Amendments to the United States Constitution.

84.     By adopting and using R.O. c. 9, § 16 to deprive Plaintiffs of rights guaranteed by the Constitution and laws of the United States and the Constitution and laws of the Commonwealth of Massachusetts, the City and its Police Department have violated and continue to violate G.L. c. 12, § 11H.

85.     As a result, Plaintiffs are entitled under G.L. c. 12, § 11I, to preliminary and permanent injunctive relief, a declaratory judgment, costs and attorney's fees, and such other relief as the Court deems just.

## Count IV
## Massachusetts Civil Rights Act, G.L. c. 12, § 11I  (R.O. c. 13, § 77(a))

86.     Plaintiffs hereby re-allege Paragraphs 1 through 85 as though fully set forth herein.

87.     As described above, by enacting R.O. c. 13, § 77(a) and issuing notices to the public aimed at deterring peaceful solicitation, and through their policy of enforcing R.O. c. 13, § 77(a), the City and its Police Department are interfering by means of threats, intimidation, and coercion, with Plaintiffs' rights to freedom of speech, due process, and equal protection as secured by Articles I and XVI of the Massachusetts Declaration of Rights, and the First and Fourteenth Amendments to the United States Constitution.

88.     The City and its Police Department's policy of enforcing R.O. c. 13, § 77(a) also violates, or imminently threatens to violate, Plaintiffs' rights to freedom of speech, due process, and equal protection as secured by Articles I and XVI of the Massachusetts Declaration of Rights, and the First and Fourteenth Amendments to the United States Constitution.

89.     By adopting and using R.O. c. 13, § 77(a) to deprive Plaintiffs of rights guaranteed by the Constitution and laws of the United States and the Constitution and laws of the Commonwealth of Massachusetts, the City and its Police Department have violated and continue to violate G.L. c. 12, § 11I.

90.     As a result, Plaintiffs are entitled to preliminary and permanent injunctive relief, a declaratory judgment, costs and attorney's fees, and such other relief as the Court deems just.

## Count V
## Declaratory Judgment (R.O. c. 9, § 16)

91.     Plaintiffs hereby re-allege Paragraphs 1 through 90 as though fully set forth herein.

92.     28 U.S.C. § 2201(a) provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

93.     As described above, Plaintiffs allege that R.O. c. 9, § 16, both as written and as enforced, violates the First and Fourteenth Amendments to the United States Constitution, and Articles I and XVI of the Massachusetts Declaration of Rights.

94.     Upon information and belief, the City and its Police Department have enforced and plan to continue enforcing R.O. c. 9, § 16.

95.     There is an actual controversy between the parties as to whether R.O. c. 9, § 16 is unconstitutional.

96.     Plaintiffs seek a declaration that R.O. c. 9, § 16 and the policy of enforcement adopted by the City and its Police Department are unconstitutional and violate Plaintiffs' rights to freedom of speech, due process, and equal protection under the First and Fourteenth Amendments to the United States Constitution, and Articles I and XVI of the Massachusetts Declaration of Rights.

## Count VI
## Declaratory Judgment (R.O. c. 13, § 77(a))

97.     Plaintiffs hereby re-allege Paragraphs 1 through 96 as though fully set forth herein.

98.     As described above, Plaintiffs allege that R.O. c. 13, § 77(a), both as written and as enforced, violates the First and Fourteenth Amendments to the United States Constitution, and Articles I and XVI of the Massachusetts Declaration of Rights.

99.     Upon information and belief, the City and its Police Department have enforced and plan to continue enforcing R.O. c. 13, § 77(a).

100.     There is an actual controversy between the parties as to whether R.O. c. 13, § 77(a)  is unconstitutional.

101.     Plaintiffs seek a declaration that R.O. c. 13, § 77(a) and the policy of enforcement adopted by the City and its Police Department are unconstitutional and violate Plaintiffs' rights to freedom of speech, due process, and equal protection under the First and Fourteenth Amendments to the United States Constitution, and Articles I and XVI of the Massachusetts Declaration of Rights.

* * * * *

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

a)  A declaratory judgment holding that the challenged ordinances violate the United States Constitution, including the First and Fourteenth Amendments to the Constitution, and the Massachusetts Declaration of Rights, including Articles I and XVI;

b)  A preliminary and permanent injunction prohibiting the City from enforcing the challenged ordinances;

c)  An award to Plaintiffs of costs and attorney's fees; and

d)  Any such other and further relief that this Court deems just and proper.

Respectfully submitted,

ROBERT THAYER, SHARON BROWNSON, and
TRACY NOVICK,

By their attorneys,


/s/ Kevin P. Martin
Kevin P. Martin (BBO# 655222)
Yvonne W. Chan (BBO# 669223)
Todd Marabella (BBO# 682525)
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
Tel.:  617.570.1000
Fax.:  617.523.1231
KMartin@goodwinprocter.com
YChan@goodwinprocter.com
TMarabella@goodwinprocter.com

Matthew R. Segal (BBO# 654489)
Sarah R. Wunsch (BBO# 548767)
American Civil Liberties Union
  of Massachusetts
211 Congress Street
Boston, Massachusetts 02110
Tel.: 617.482.3170
Fax.: 617.451.0009
MSegal@aclum.org
SWunsch@aclum.org


Dated:   May 13, 2013