UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

ROBERT THAYER, SHARON BROWNSON,
and TRACY NOVICK,

    Plaintiffs,

  v.

CITY OF WORCESTER,

    Defendant.

Civil Action No. 13-40057

## **MEMORANDUM OF LAW IN SUPPORT OF**
## **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Kevin P. Martin (BBO# 655222)
Yvonne W. Chan (BBO# 669223)
Todd Marabella (BBO# 682525)
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
Tel.:  617.570.1000
Fax.:  617.523.1231
KMartin@goodwinprocter.com
YChan@goodwinprocter.com
TMarabella@goodwinprocter.com

Matthew R. Segal (BBO# 654489)
Sarah R. Wunsch (BBO# 548767)
American Civil Liberties Union
 of Massachusetts
211 Congress Street
Boston, Massachusetts 02110
Tel.: 617.482.3170
Fax.: 617.451.0009
MSegal@aclum.org
SWunsch@aclum.org

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

FACTS ............................................................................................................................... 2

I.    The Challenged Ordinances ................................................................................. 2

II.   The City's Enforcement of the Challenged Ordinances ..................................... 5

III.   The Plaintiffs ....................................................................................................... 6

ARGUMENT ..................................................................................................................... 7

I.    Plaintiffs Are Likely to Prevail on Their Claims ............................................... 7

    A.    Panhandling and Solicitation Are Protected Under the First Amendment ............ 7

    B.    Both Ordinances Are Unconstitutional Restrictions on Speech ............................ 9

        1.    R.O. c. 9, § 16 Is An Unconstitutional Content-Based Restriction ........... 9

            a.    The Ordinance Is Not Necessary to Achieve a Compelling Interest .......................................................................................... 10

            b.    R.O. c. 9, § 16 Is Overboard and Not Narrowly Drawn ............... 11

        2.    R.O. c. 13, § 77(a) Is An Unconstitutional Restriction on Speech ........... 13

            a.    The Ordinance Is Not an "Incidental" Restriction on Speech ...... 13

            b.    R.O. c. 13, § 77(a) Is Not "Narrowly Tailored" ........................... 15

    C.    Both Ordinances Are Unconstitutionally Vague ................................................. 15

    D.    Both Ordinances Impermissibly Discriminate Against the Poor .......................... 17

II.   Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction ....................... 19

III.   In Light of Plaintiffs' Likelihood of Success and Showing of Irreparable Harm, The Balance of Harms Favors Plaintiffs ....................................................................... 19

IV.   An Injunction Serves the Public Interest ......................................................... 20

CONCLUSION................................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**C**ASES

*ACLU v. Johnson,*
    194 F.3d 1149 (10th Cir. 1999) ....................................................19, 20

*Benefit v. City of Cambridge,*
    679 N.E.2d 184 (Mass. 1997) ............................................8, 9, 10, 12

*Berkeley Cmty. Health Project v. City of Berkeley,*
    902 F. Supp. 1084 (N.D. Cal. 1995) ..........................................9, 13

*Blair v. Shanahan,*
    775 F. Supp. 1315 (N.D. Cal. 1991), *vacated as moot*, 919 F. Supp. 1361 (N.D. Cal.
    1996) ....................................................................................8

*C.C.B. v. State,*
    458 So. 2d 47 (Fla. App. 1984)....................................................8

*City of Chicago v. Morales,*
    527 U.S. 41 (1999)............................................................15, 17

*City of Cleburne v. Cleburne Living Center,*
    473 U.S. 432 (1985)..........................................................17, 18

*City of Houston v. Hill,*
    482 U.S. 451 (1987)................................................................16

*City of Watseka v. Illinois Pub. Action Council,*
    796 F.2d 1647 (7th Cir. 1986) ....................................................12

*Elam Constr. v. Reg'l Transp. Dist.,*
    129 F.3d 1343 (10th Cir. 1997) ....................................................20

*Elrod v. Burns,*
    427 U.S. 347 (1976)............................................................2, 19

*Gooding v. Wilson,*
    405 U.S. 518 (1972)..................................................................9

*Henry v. City of Cincinnati,*
    No. C-1-03-509, 2005 WL 1198814 (S.D. Ohio Apr. 28, 2005)..........................10

*Hoye v. City of Oakland,*
    653 F.3d 835 (9th Cir. 2011) ......................................................14

*Ledford v. State*,
652 So. 2d 1254 (Fla. App. 1995)........................................................8

*Loper v. New York City Police Dep't*,
999 F.2d 699 (2d Cir. 1993)........................................................8, 9, 10

*McGuire v. Reilly*,
386 F.3d 45 (1st Cir. 2004)........................................................14

*Parr v. Mun. Court for Monterey-Carmel Judicial Dist*,
479 P.2d 353 (Cal. 1971)........................................................19

*People v. Griswold*,
821 N.Y.S.2d 394 (N.Y. City Ct. 2006)........................................9, 12, 15

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983)........................................................10, 13

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992)........................................................9

*Regan v. Taxation with Representation of Wash.*,
461 U.S. 540 (1983)........................................................17

*Schneider v. New Jersey*,
308 U.S. 147 (1939)........................................................9

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*,
699 F.3d 1 (1st Cir. 2012)........................................................19

*Speet v. Schuette*,
889 F. Supp. 2d 969 (W.D. Mich. 2012)........................................8

*State v. Boehler*,
262 P.3d 637 (Ariz. Ct. App. 2011)........................................10, 11

*United States v. O'Brien*
391 U.S. 367 (1968)........................................................13, 15

*United States v. Robel*,
389 U.S. 258 (1967)........................................................9

*Village of Schaumburg v. Citizens for a Better Environment*,
444 U.S. 620 (1980)........................................................7, 11

*Wagner v. City of Holyoke*,
100 F. Supp. 2d 78 (D. Mass. 2000)........................................7, 19, 20

iii

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989)......................................................................................13

*Westfield High Sch. L.I.F.E. Club v. City of Westfield,*
    249 F. Supp.2d 98 (D. Mass. 2003) ...........................................................20

*Wilkinson v. State,*
    860 F. Supp. 2d 1284 (D. Utah 2012) ..............................................9, 10, 15

## STATUTES AND OTHER AUTHORITIES

G.L. c. 265, § 13A..........................................................................................10

R.O. c. 9, § 16 ......................................................................................... passim

R.O. c. 13, § 77(a) ................................................................................... passim

U.S. Const.1ˢᵗ Am. ................................................................................... passim

U.S. Const.14ᵗʰ Am. ...........................................................................2, 15, 17

Plaintiffs Robert Thayer, Sharon Brownson, and Tracy Novick (collectively, "Plaintiffs") submit this memorandum of law in support of their Motion for Preliminary Injunction against Defendant City of Worcester (the "City").

## INTRODUCTION

This action concerns two ordinances recently adopted by the City in order to reduce "panhandling" by the poor and homeless. While the City has sought to justify the laws with concerns about "aggressive" behavior, the ordinances' scope is not limited to such conduct. Instead, they prohibit a substantial volume of peaceful and constitutionally-protected speech. One ordinance, which purports to prohibit so-called "aggressive" solicitation, proscribes a wide range of conduct, including *any* form of solicitation "after dark" (which, as defined in the ordinance, begins as early as 3:45 p.m. in the winter). The other ordinance broadly prohibits standing or walking on any traffic islands, medians, or rotaries, areas traditionally used not only by the homeless and others to solicit donations, but by also politicians and others as fora for speech. By imposing such wide-ranging restrictions, the ordinances substantially and unjustifiably interfere with Plaintiffs' free speech rights. For the reasons given herein, Plaintiffs are entitled to a preliminary injunction against the enforcement of the ordinances.

First, Plaintiffs are likely to succeed on their claims that the ordinances are unconstitutional on their face. Content-based restrictions such as the ordinance prohibiting "aggressive" solicitation are presumed to be invalid and the City's ordinance cannot survive the strict scrutiny that is applied to such regulations. The City's interest in allowing citizens to avoid the discomfort of being approached or spoken to by the homeless is hardly a "compelling" government interest. Nor is the ordinance necessary to assure safety, given that other statutes already criminalize truly "aggressive" behavior. The "aggressive" solicitation ordinance

prohibits a significant amount of peaceful and constitutionally-protected speech, such as merely holding a sign, and thus is not narrowly drawn to achieve the City's asserted purpose. The ordinance targeted at solicitation and other forms of speech on roadways and traffic islands—many of which are quite expansive and are accessible by crosswalks—cuts a similarly overbroad swathe through protected speech. Moreover, both ordinances are unconstitutionally vague, as they fail in many instances to specify the prohibited conduct, leaving police free to implement the City's pre-announced, discriminatory policy of selectively enforcing the ordinances against the poor. In doing so, the ordinances and the City's selective enforcement policy violate not only the First Amendment, but also the Equal Protection Clause of the Fourteenth Amendment.

Second, Plaintiffs are likely to suffer irreparable harm absent injunctive relief. If the City is permitted to continue enforcing the ordinances, Plaintiffs will either risk arrest if they choose to exercise their First Amendment rights, or they will be forced to restrict their speech in order to avoid arrest. As the Supreme Court has explained, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Third, the balance of harms favors an injunction. Any interest that the City has in enforcing these two ordinances is far outweighed by Plaintiffs' First Amendment rights.

Lastly, the public interest also calls for an injunction. Given the significant overbreadth and vagueness of the ordinances, an injunction will protect not only Plaintiffs' rights, but also the rights of non-plaintiffs whose speech may be chilled.

## FACTS

### I.    THE CHALLENGED ORDINANCES.

The ordinances at issue in this case were adopted by the City in January 2013 in an effort to eliminate "panhandling"—the solicitation of donations from passerby by the poor and the

homeless. This was not the first time that the City had tried to eliminate panhandling, which the City perceives to be an undesirable activity. In 2005, the City Council adopted an "action plan" to reduce panhandling by deterring the public from giving to poor or homeless people who solicit donations. *See* Declaration of Todd Marabella ("Marabella Decl."), Ex. 1. As part of this campaign, the City erected anti-panhandling signs throughout the city and organized a citywide distribution of a brochure declaring that "Panhandling is not the Solution!" *See id.*

The 2005 anti-panhandling campaign was criticized by many in the community, and the anti-panhandling signs that had been placed around Worcester were taken down in 2006. *See* Marabella Decl., Ex. 2. In the summer of 2012, however, the City Council asked the City Manager, Michael V. O'Brien, to present a new strategy to reduce panhandling throughout Worcester. In response, Mr. O'Brien recommended a program to compile data concerning panhandling and a "tracking mechanism" for incidences of panhandling, as well as a public education campaign—like the one that failed in 2005—to discourage donations. Marabella Decl., Ex. 3. But Mr. O'Brien also noted that panhandling and solicitation are constitutionally protected speech, and acknowledged that there are state statutes, such as laws against trespass, assault and battery, and disorderly conduct, that address "aggressive" conduct. *Id.* Nevertheless, in October 2012, Mr. O'Brien presented to the City Council two proposed ordinances "aimed at reducing the incidence of panhandling in our community." Marabella Decl., Ex. 4.

The first ordinance, R.O. c. 9, § 16, would make it "unlawful for any person to beg, panhandle or solicit any other person in an aggressive manner," and allows the arrest of any person who fails to comply with a police officer's request to cease and desist in prohibited conduct. Marabella Decl., Ex. 5. The ordinance defines "aggressive manner" to encompass, *inter alia*, the following conduct:

(2) continuing to solicit from a person after the person has given a negative response to such soliciting;

* * *

(4) intentionally blocking or interfering with the safe or free passage of a pedestrian or vehicle by any means, including unreasonably causing a pedestrian or vehicle operator to take evasive action to avoid physical contact;

* * *

(6) following the person being solicited, with the intent of asking that person for money or other things of value;

(7) soliciting money from anyone who is waiting in line for tickets, for entry to a building or for any other purpose;

* * *

(10) soliciting any person within 20 feet of the entrance to, or parking area of, any bank, automated teller machine, automated teller machine facility, check cashing business, mass transportation facility, mass transportation stop, public restroom, pay telephone or theatre or place of public assembly, or of any outdoor seating area of any cafe, restaurant or other business;

(11) soliciting any person in public after dark, which shall mean the time from one-half hour before sunset to one-half hour after sunrise.

*Id*.

The second ordinance, R.O. c. 13, § 77(a), would prohibit standing or walking on a traffic island or roadway, except for the purpose of crossing at an intersection or crosswalk, for the purpose of entering or exiting a vehicle, or "for some other lawful purpose." Marabella Decl., Ex. 6. Like the "aggressive" solicitation ordinance, Section 77(a) allows the arrest of any individual who refuses to comply with a police officer's "request or order . . . [to] remove themselves from such roadway or traffic island." *Id*.

These proposed ordinances were the subject of much public debate, a repeated focus of which was the potential impact of the proposed ordinances on so-called "Tag Days": permits issued by the City to non-profit groups and organizations such as schools, churches, and sports teams, allowing them to solicit donations on sidewalks and traffic islands, and to enter the "traveled portion of any public way" in order to "receive a contribution offered by a motorist." *See* Marabella Decl., Ex. 7; Declaration of Chris Robarge ("Robarge Decl."), ¶¶ 17, 24.[1] The concern about the potential effect on "Tag Days" was so great that the City Council requested a legal opinion from the City Solicitor, David Moore, about the constitutionality of allowing an exemption under the ordinances for "Tag Days" while prohibiting the homeless from the same conduct. In response, Mr. Moore advised that the Constitution did not permit the City to "create a distinction based on the content or the nature of the speaker." Marabella Decl., Ex. 8. When later asked during a public hearing, however, about political candidates who campaign in Newton Square—a rotary in downtown Worcester—Mr. Moore responded that the ordinances afforded an "element of discretion" and that police would not issue any warnings unless there was a "public safety issue"—thus implying that while the City could not *expressly* distinguish between types of speech, it could do so *tacitly* through selective enforcement. *See* Robarge Decl., ¶ 26; Marabella Decl., Exs. 11, 12.

In January 2013, after several months of debate and despite objections from several City Councilors and community members, the City Council passed the two ordinances.

## II.    THE CITY'S ENFORCEMENT OF THE CHALLENGED ORDINANCES.

After the ordinances were adopted in late January, the City and its Police Department stated their intent to "immediately enforce against aggressive panhandling." *See* Marabella

---

[1]    When the City adopted its anti-panhandling campaign in 2005, the report submitted by the City Manager had made it a point to note that "tag days" would not be affected. *See* Marabella Decl., Ex. 1.

Decl. Ex. 13. For the first few weeks after the ordinances took effect, the Worcester Police Department ("Police Department") issued warnings and handed out cards to the homeless stating that "panhandling" was prohibited "at or in" roadways, rotaries, and traffic medians and islands. *See* Declaration of Robert Thayer ("Thayer Decl."), ¶ 11 & Ex. 2; Declaration of Sharon Brownson ("Brownson Decl."), ¶ 10 & Ex. 1. The Department of Public Works also distributed a flyer misleadingly informing members of the public that offering donations to a solicitor standing in a roadway or on a median was now prohibited. *See* Marabella Decl., Ex. 14. These distributions confirmed that the City's enforcement of the ordinances is focused on "panhandling," and not on other speech or solicitation of donations occurring on roadways, rotaries, or traffic medians and islands. Since then, the Police Department has in fact arrested several individuals for panhandling in violation of the ordinances. *See* Robarge Decl. ¶ 29 & Ex. 6. On the other hand, the Department refused even to issue a warning during a protest that took place shortly after the ordinances were adopted, in which several protesters stood on a traffic median in Lincoln Square, a clear violation of Section 77(a). *See* Robarge Decl. ¶ 28 & Ex.5.

## III.   THE PLAINTIFFS.

Plaintiffs are individuals who regularly solicit donations or engage in political and other protected speech in Worcester. Robert Thayer and Sharon Brownson are residents of Worcester who have been homeless for approximately three years, and who rely on the donations they receive from passersby in order to purchase basic necessities like food. Thayer Decl. ¶¶ 4-5; Brownson Decl. ¶ 5-6. Mr. Thayer and Ms. Brownson typically stand on the sidewalk with a sign with messages asking for help or money, and they do not step into the street or approach a vehicle unless an occupant of a stopped vehicle has indicated that he or she wishes to make a donation. Thayer Decl. ¶¶ 6-7; Brownson Decl. ¶ 8. Since the ordinances were adopted, Mr. Thayer and Ms. Brownson have been told by Worcester police officers that they are not

permitted to solicit for donations next to the road. Thayer Decl. ¶¶ 11, 13; Brownson Decl. ¶ 9-10. Tracy Novick is an elected member of the Worcester School Committee who has campaigned (along with other local politicians, including members of the City Council) on traffic islands and rotaries during previous elections. Declaration of Tracy Novick ("Novick Decl."), ¶ 5. Ms. Novick plans to seek re-election this fall. *Id.* ¶ 10.

## ARGUMENT

In determining whether to grant preliminary injunctive relief, the Court must consider and weigh four factors: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." *Wagner v. City of Holyoke*, 100 F. Supp. 2d 78, 82 (D. Mass. 2000). All of these factors weigh in favor of a preliminary injunction here.

## I.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR CLAIMS.

### A.   Panhandling and Solicitation Are Protected Under the First Amendment.

It is well-established that solicitation, panhandling, and begging are constitutionally protected forms of speech. In *Village of Schaumburg v. Citizens for a Better Environment*, the Supreme Court struck down an ordinance that prohibited solicitation by certain organizations, holding that "charitable appeals for funds, on the street or door to door, involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment." 444 U.S. 620, 632 (1980). As the Court explained, "solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for

particular views on economic, political, or social issues," and "without solicitation the flow of such information and advocacy would likely cease." *Id.* at 620-21.

Likewise, begging and panhandling are expressive activities that are protected by the First Amendment. As the Second Circuit has observed:

> Begging frequently is accompanied by speech indicating the need for food, shelter, clothing, medical care or transportation. Even without particularized speech, however, the presence of an unkempt and disheveled person holding out his or her hand or a cup to receive a donation itself conveys a message of need for support and assistance.

*Loper v. New York City Police Dep't*, 999 F.2d 699, 704 (2d Cir. 1993); *see also Benefit v. City of Cambridge*, 679 N.E.2d 184, 188 (Mass. 1997) (concluding that "there is no distinction of constitutional dimension between soliciting funds for oneself and for charities and therefore that peaceful begging constitutes communicative activity protected by the First Amendment").

Accordingly, numerous courts have held that restrictions on begging or panhandling are unconstitutional. In *Benefit*, for example, the Supreme Judicial Court struck down a Massachusetts statute which made it a crime to beg without a license, finding that there was no compelling state interest justifying such a broad restriction on the right to freedom of speech:

> *The statute intrudes not only on the right of free communication, but it also implicates and suppresses an even broader right—the right to engage fellow human beings with the hope of receiving aid and compassion.* . . . If such a basic transaction as peacefully requesting or giving casual help to the needy may be forbidden in all such places, then we may belong to the government that regulates us and not the other way around.

*Benefit*, 679 N.E.2d at 190 (emphasis added). The list of decisions striking down restrictions on begging is extensive. *See*, *e.g.*, *Loper*, *supra*; *Ledford v. State*, 652 So. 2d 1254 (Fla. App. 1995); *C.C.B. v. State*, 458 So. 2d 47 (Fla. App. 1984); *Speet v. Schuette*, 889 F. Supp. 2d 969 (W.D. Mich. 2012); *Blair v. Shanahan*, 775 F. Supp. 1315 (N.D. Cal. 1991), *vacated as moot*,

919 F. Supp. 1361 (N.D. Cal. 1996); *Wilkinson v. State*, 860 F. Supp. 2d 1284 (D. Utah 2012); *People v. Griswold*, 821 N.Y.S.2d 394 (N.Y. City Ct. 2006); *Berkeley Cmty. Health Project v. City of Berkeley*, 902 F. Supp. 1084 (N.D. Cal. 1995).

**B.      Both Ordinances Are Unconstitutional Restrictions on Speech.**

The Supreme Court "has characterized the freedom of speech and that of the press as fundamental personal rights and liberties." *Schneider v. New Jersey*, 308 U.S. 147, 161 (1939). Accordingly, any governmental regulation of that freedom must be done with "[p]recision." *United States v. Robel*, 389 U.S. 258, 265 (1967) (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)).   "[W]hen statutes regulate or proscribe speech and when 'no readily apparent construction suggests itself as a vehicle for rehabilitating the statutes in a single prosecution,' the transcendent value to all society of constitutionally protected expression is deemed to justify allowing 'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.'"   *Gooding v. Wilson*, 405 U.S. 518, 520-21 (1972) (citation omitted) (quoting *Dombrowski v. Pfister*, 280 U.S. 479, 486 (1965)).   Here, both of the challenged ordinances are, on their face, unconstitutionally overbroad restrictions on speech.

1.      R.O. c. 9, § 16 Is An Unconstitutional Content-Based Restriction.

As the Supreme Court has repeatedly held, "[c]ontent-based regulations are presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).  R.O. c. 9, §16 incontrovertibly enacts a content-based regulation by restricting only certain types of speech—namely, panhandling, begging, and soliciting.  *See Benefit*, 679 N.E.2d at 188-89 (statute that criminalized only requests for direct, charitable aid was content-based "because the content of the individual's message determines criminal guilt or innocence"); *Loper*, 999 F.2d at 705

(ordinance "is not content neutral because it prohibits all speech related to begging").[2] Accordingly, the City "must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end"—in other words, it must survive "strict scrutiny." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *see also Benefit*, 679 N.E.2d at 189. It is a test the ordinance cannot pass.

      a.      <u>The Ordinance Is Not Necessary to Achieve a Compelling Interest.</u>

The City cannot demonstrate that the ordinance is necessary to support a compelling state interest. In adopting it, the City made a number of purported findings about the "real, apparent or perceived coercion" that individuals may experience when solicited, and expressed its intent to "protect[] . . . [the] right to not be unduly coerced." R.O. c. 9, § 16(a)(3), (4). However, as the Supreme Judicial Court explained in *Benefit*, the City's interest in protecting people who feel "accused, intimidated, or harassed" when solicited is simply insufficient to justify restrictions on begging: "*A listener's annoyance or offense at a particular type of communicative activity does not provide a basis for a law burdening that activity*." *Benefit*, 679 N.E.2d at 190 (emphasis added); *see also Boehler*, 262 P.3d at 644 (ban on solicitation after dark could not be justified by concerns about fear and intimidation, as "[o]ur constitution does not permit government to restrict speech in a public forum merely because the speech may make listeners uncomfortable").

Nor is the ordinance necessary to serve any governmental interest in preventing crime, as "[t]here is ample authority available to the government to deal with beggars who transgress peaceful limits." *Benefit*, 679 N.E.2d at 109, n.7; *Loper*, 999 F.2d at 701-02, 705 (noting statutes available to address fraud, intimidation, coercion, harassment, and assault); *see, e.g.*, G.L. c. 265,

---

[2]    *But see State v. Boehler*, 262 P.3d 637, 644 (Ariz. Ct. App. 2011) (noting disagreement as to whether anti-solicitation ordinances are content-neutral, but finding that ordinance failed to survive constitutional scrutiny even if it were content-neutral); *Wilkinson*, 860 F. Supp. 2d at 1290 (finding statute unconstitutional even if construed as a content-neutral regulation); *Henry v. City of Cincinnati*, No. C-1-03-509, 2005 WL 1198814 (S.D. Ohio Apr. 28, 2005) (anti-solicitation ordinance was content-neutral; denying motion to dismiss). In any event, Section 16 would fail to survive even the scrutiny applied to content-neutral regulations. *See infra* n.4.

§ 13A (assault and battery). In fact, the City Manager has noted the availability of these "other State statutes that deal with such behavior." Marabella Decl., Ex. 3 (July 17, 2012 Letter) (citing laws on trespass, assault and battery, disorderly conduct, and interfering with vehicular traffic).[3]

      b.      <u>R.O. c. 9, § 16 Is Overbroad and Not Narrowly Drawn.</u>

Section 16 is also overbroad and not narrowly drawn to achieve any compelling interest, as it restricts a significant volume of peaceful and non-threatening speech. For example, the ordinance restricts all forms of solicitation at any time "after dark," which is defined as beginning half an hour before sunset and ending half an hour after sunrise. R.O. c. 9, §16(c)(11). As an Arizona appeals court noted in striking down a similar but narrower ordinance, such an ordinance restricts all solicitation "without regard to whether it is made in an abusive, aggressive or intimidating manner," and "would prohibit both a cheery shout by a Salvation Army volunteer asking for holiday change and a quiet offer of a box of Girl Scout cookies by a shy pre-teen if either were uttered on a street corner after dark." *Boehler*, 262 P.3d at 643-44. Moreover, the ordinance cannot be justified by the theory that solicitations "after dark" are more likely to cause fear and intimidation because, as in *Boehler*, the ordinance "does not distinguish between solicitations that occur in dark alleyways and solicitations that take place in lighted buildings or well-lit street corners." *Id.* at 644.

Worse yet, unlike the *Boehler* ordinance, Section 16 bans *all* solicitation "after dark"— including non-vocal solicitation, such as standing quietly on a sidewalk and holding a sign. *See* R.O. c. 9, § 16(c) (defining "solicit" or "soliciting" to include "written, or printed word," and "signs"). Because the City cannot possibly demonstrate that such solicitation is likely to cause

---

[3]    Moreover, the existence of these other alternatives for addressing the behavior that the City purports to be concerned about demonstrates that the ordinance is not narrowly drawn to address those concerns. *See Village of Schaumburg*, 444 U.S. at 637 (ordinance not narrowly tailored because "[t]he Village's legitimate interest in preventing fraud can be better served by measures less intrusive than a direct prohibition on solicitation").

fear and intimidation—particularly where "after dark" is defined to begin *before* sunset and end *after* sunrise, a period that begins as early as 3:45 p.m. in the winter—this restriction is not "narrowly tailored" to address concerns about safety and coercion. *See City of Watseka v. Illinois Pub. Action Council*, 796 F.2d 1647 (7th Cir. 1986) (ordinance banning door-to-door solicitation between 5 p.m. and 9 p.m. was not narrowly tailored where city could not present any evidence that fraud and embezzlement were more prevalent after 5 p.m.).

Other provisions in Section 16 are similarly overbroad, as they restrict a substantial amount of peaceful, non-threatening speech. For example, the ordinance prohibits "soliciting money from anyone who is waiting in line for tickets, for entry to a building or for any other purpose," and "soliciting any person within 20 feet of the entrance to" banks, ATMs, mass transportation stops and facilities, pay telephones, and other locations. R.O. c. 9, § 16(c)(7), (10). These provisions are not "narrowly tailored" as the City cannot plausibly prove a link between all solicitation in these locations and increased concerns about fear and coercion. Indeed, the fact that the ordinance does not ban other forms of solicitation—such as solicitation of *future* donations—conducted in these locations demonstrates that the City does not believe that individuals are particularly subject to fear and coercion if approached while waiting in line, or near a bank or ATM. *See Griswold*, 821 N.Y.S.2d at 402-03 (statute was unconstitutional where plaintiff was prohibited from soliciting on sidewalk and city asserted that ban was necessary to prevent disruption of traffic, but city did not ban other similar activities on sidewalks). As the Supreme Judicial Court found, there is "no compelling State interest . . . that would warrant punishing a beggar's peaceful communication with his or her fellow citizens in a public place." *Benefit*, 679 N.E.2d at 190. Accordingly, Plaintiffs are likely to succeed on their

claim that the ordinance is an unconstitutional content-based restriction of speech.[4]

    2.    <u>R.O. c. 13, § 77(a) Is An Unconstitutional Restriction on Speech.</u>

The ordinance regulating standing or walking on traffic islands and roadways, R.O. c. 13, § 77(a), is also facially overbroad because it effectively restricts a substantial volume of speech that does not implicate any safety concerns. Moreover, the City's policy of selectively enforcing this ordinance is content-based and cannot survive strict scrutiny.

    a.    <u>The Ordinance Is Not an "Incidental" Restriction on Speech.</u>

Although § 77(a) nominally addresses where people may stand or walk, it cannot be upheld as an "incidental" limitation on speech resulting from governmental restriction of nonspeech conduct. In *United States v. O'Brien*, the Supreme Court held that "a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms," but only under these circumstances: "[1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U.S. 367, 376-77 (1968).

Here, § 77(a) clearly fails the third prong, as it was adopted as part of "a number of strategies aimed at reducing the incidence of panhandling in our community." *See supra* at 3. The effect on speech is not incidental to the ordinance's overall purpose; instead, the *purpose* of the ordinance is to restrict speech. *See Berkeley Cmty. Health Project*, 902 F. Supp. at 1094 (N.D. Cal. 1995) (third *O'Brien* prong not met where ordinance prohibiting sitting on parts of

---

[4]    In fact, the ordinance is so overbroad that it would also fail to meet the level of scrutiny applied to content-*neutral* regulations. *See Perry*, 460 U.S. at 45 (state may enforce content-neutral regulations that are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication"); *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989) ("Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals").

sidewalk was intentionally directed at and intended to reduce the amount of solicitation on the streets). It is clear that the City was motivated not by safety concerns, but by a desire to eliminate solicitations by the homeless. Until this ordinance was adopted as part of an overall "strateg[y]" to "reduc[e] the incidence of panhandling in [the] community," (*see supra* at 3), the City had not considered standing or walking upon a traffic island to be unsafe. In fact, until the adoption of this ordinance, the City routinely issued "Tag Day" permits to schools and other groups, explicitly allowing individuals—some as young as sixteen—to solicit "from *sidewalks or traffic islands*." Marabella Decl., Ex 7 (Sample Tag Day Permit) (emphasis added). Moreover, both the Police Chief and Fire Lieutenant have acknowledged that there have been no injuries or accidents resulting from "Tag Day" activities. *See* Marabella Decl., Ex. 15.

What is more, although the ordinance is not facially limited to those panhandling, the City has made clear that it will not be enforced against other individuals. For example, when asked whether the ordinance would prohibit political candidates from standing on the rotary in Newton Square, the City Solicitor responded that the ordinance is not violated until a police officer's request has been disobeyed, and had an "element of discretion" that allowed the police to issue a warning only if there was a "clear public safety issue"—implying that the ordinance would not be enforced against politicians. *See supra* at 5. Likewise, the Police Department refused to make any arrests or issue any warnings during a recent protest in which several people stood on a traffic median. *Supra* at 6. Such selective enforcement is a content-based regulation that is presumptively invalid.[5] *See Hoye v. City of Oakland*, 653 F.3d 835, 853 (9th Cir. 2011) (city's policy of distinguishing between types of speech in enforcing a facially valid ordinance

---

[5] Although Plaintiffs are bringing a facial challenge to the ordinance, an as-applied challenge to the City's selective enforcement of the ordinance is permitted under *McGuire v. Reilly*, 386 F.3d 45 (1st Cir. 2004), as there is a "showing of intent on the part of government officials" to selectively enforce the ordinance based on the content of speech, and there is also evidence that "police turned a blind eye" toward certain speech. *Id.* at 63, 65.

was an unconstitutional content-based regulation). Nor can the City's selective enforcement policy survive strict scrutiny, as there is no reason why prohibiting the homeless from standing on traffic islands to solicit donations is necessary to protect safety, if others are permitted to engage in the same conduct. *Griswold*, 821 N.Y.S.2d at 402-03.

b. R.O. c. 13, § 77(a) Is Not "Narrowly Tailored."

The ordinance also fails the fourth *O'Brien* prong—that the restriction on First Amendment freedoms be "no greater than is essential to the furtherance of [the government's] interest," because it restricts substantially more speech than is necessary to serve the City's asserted interest in protecting safety. *O'Brien*, 391 U.S. at 377. For example, the ordinance prohibits *any* solicitation on any traffic island regardless of whether it is unsafe, including, *e.g.*, expansive traffic islands reachable by crosswalks and surrounded by traffic lights. *See* Robarge Decl. Ex. 1. It also precludes stepping into fully stopped traffic to accept a donation, an activity previously permitted for years to numerous "Tag Day" groups without incident. *See supra* at 5, 14. Because the ordinance prohibits safe conduct it is unconstitutionally overbroad and cannot survive. *See Wilkinson*, 860 F. Supp. 2d at 1290 (where statute prohibited solicitation even on a "quiet residential street" or "alongside a gravel road," it was "substantially broader than necessary to achieve the government's interest"); *Griswold*, 821 N.Y.S.2d at 402 (ordinance prohibiting solicitation from occupant of vehicle was unconstitutional).

C. **Both Ordinances Are Unconstitutionally Vague.**

"It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). Both ordinances here fail that test.

First, they fail to adequately define the conduct that is prohibited. For example, Section 16 prohibits "continuing to solicit from a person after the person has given a negative

15

response to such soliciting," but defines "solicit" to include the use of signs, and does not explain whether an individual must stop displaying a sign once a passerby has "given a negative response." *See* R.O. c. 9, § 16(c)(2). Similarly, a "traffic island" is defined as "any area or space within a roadway which is set aside by the use of materials or paint for the purpose of separating or controlling the flow of traffic and which is not constructed or intended for use by vehicular traffic or by pedestrians," R.O. c. 13, § 1, but the ordinance does not explain how anyone should know whether a traffic island that is raised, paved, and adjacent to crosswalks was "constructed or intended for use . . . by pedestrians." *Id.*; *see, e.g.*, Robarge Decl., Ex. 1.

Second, the vagueness of these ordinances allows arbitrary police enforcement. Because it is unclear whether the continued display of a sign after receiving a "negative response," or standing on a raised and paved traffic island next to a crosswalk, are violations of the ordinances, it is up to individual police officers to determine whether the ordinances have been violated. The City's use of vague and undefined terms in the challenged ordinances affords police virtually unbridled discretion to decide when the ordinances have been violated:

> The ordinance's plain language is admittedly violated scores of times daily, yet only some individuals – those chosen by the police in their unguided discretion – are arrested. *Far from providing the "breathing space" that "First Amendment freedoms need . . . to survive," the ordinance is susceptible of regular application to protected expression.* We conclude that the ordinance is substantially overbroad, and that the Court of Appeals did not err in holding it facially invalid.

*City of Houston v. Hill*, 482 U.S. 451, 467 (1987) (emphasis added).

This problem is further compounded by the fact that the ordinances are not violated until a police officer has ordered or requested that an individual cease and desist his or her behavior, and that request or order is disobeyed. *See* R.O. c. 9, §16(d); R.O. c. 13, § 77(a). Accordingly, individual police officers not only have full discretion to decide which individuals to arrest, but

also to decide who is *eligible* to be arrested.[6]  The cease-and-desist orders under these ordinances are reminiscent of dispersal orders that the Supreme Court has struck down:

> Although it is true that a loiterer is not subject to criminal sanctions unless he or she disobeys a dispersal order, the loitering is the conduct that the ordinance is designed to prohibit.  If the loitering is in fact harmless and innocent, *the dispersal order itself is an unjustified impairment of liberty*.

*Morales*, 527 U.S. at 58-59 (emphasis added).

Finally, these concerns about discriminatory enforcement are not merely hypothetical. The City and Police Department have already enforced the ordinances selectively against the homeless, while allowing other protesters to violate the ordinances without repercussions and hinting that campaigning politicians will be left alone.  *See supra* at 6, 14.

### D.  <u>Both Ordinances Impermissibly Discriminate Against the Poor.</u>

The City's discriminatory enforcement policy, as well as the ordinances themselves, also violate Plaintiffs' rights to equal protection.  "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). Classifications by race, alienage, or national origin, *or regulations which "impinge on personal rights protected by the Constitution,"* are "subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest."  *Id.* at 440 (emphasis added); *see also Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 547 (1983) (describing the "higher level of [equal protection] scrutiny" that applies to the regulation "of a fundamental right, such as freedom of speech").  Even regulations that do not infringe fundamental rights, and

---

[6]  Indeed, the City Solicitor pointed to this feature of the ordinance and the "element of discretion" given to police in determining when to issue a warning when asked about the potential application of the ordinances to political candidates campaigning in Newton Square.  *See supra* at 5.

so are subject to "rational basis" review, must be "rationally related to a legitimate governmental purpose." *City of Cleburne*, 473 U.S. at 446. "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Id.* Moreover, "some objectives—such as 'a bare . . . desire to harm a politically unpopular group'—are not legitimate state interests." *Id.* at 446-47 (internal citation omitted).

Here, whether analyzed under strict scrutiny or rational basis review, the City is engaged in unconstitutional discrimination against the poor and the homeless. Although the ordinances purportedly apply to anyone who engages in the prohibited activities, the evidence is that they are targeted at the poor and the homeless. The ordinances were proposed and adopted as part of a strategy to reduce panhandling in Worcester. *See supra* at 3. The City has indicated that enforcement will be targeted at homeless individuals who solicit donations, while others, such as politicians, will not be arrested or even warned. *See supra* at 5-6. And although the City Solicitor advised the City Council that the City could not distinguish between the poor and other solicitors, the definitions of "solicitation" and "begging" in Section 16 do precisely that. By limiting the ordinance's reach to requests or solicitations for *immediate* donations, those definitions most immediately target those who are in immediate need of money: the poor.

That targeting of the poor bears no rational relationship to the stated goal of protecting against fear and coercion. Rather, the City's implementation and enforcement of these ordinances has been motivated by prejudice, an intent to prevent the poor and the homeless from soliciting donations, and a desire to cater to the wishes of local business owners who do not want homeless individuals soliciting donations nearby. Those are not legitimate interests. *See City of Cleburne*, 473 U.S. at 448. As the Supreme Court of California stated in striking down an ordinance which prohibited, among other things, sitting on a public lawn, and which was

intended to eliminate the perceived "influx" of "hippies":

> [W]e cannot be oblivious to the transparent, indeed the avowed, purpose and the inevitable effect of the ordinance in question: to discriminate against an ill-defined social caste whose members are deemed pariahs by the city fathers. This court has been consistently vigilant to protect racial groups from the effects of official prejudice, and we can be no less concerned because the human beings currently in disfavor are identifiable by dress and attitudes rather than by color.

*Parr v. Mun. Court for Monterey-Carmel Judicial Dist*, 479 P.2d 353 (Cal. 1971).

## II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION.

Absent an injunction, Plaintiffs will continue to suffer irreparable harm from the City's infringement of their First Amendment rights. As the Supreme Court has held, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod,* 427 U.S. at 373; *see also Wagner*, 100 F. Supp. 2d at 82 ("The loss of First Amendment freedoms unquestionably constitutes irreparable injury."). "Accordingly, irreparable injury is presumed upon a determination that the movants are likely to prevail on their First Amendment claim." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 11 (1st Cir. 2012). Here, Plaintiffs have demonstrated that they are likely to succeed on their claims, and therefore they have also demonstrated that they are being irreparably harmed. In addition, Plaintiffs Mr. Thayer and Ms. Brownson will suffer the irreparable harm of lost opportunities to receive donations from third parties.

## III. IN LIGHT OF PLAINTIFFS' LIKELIHOOD OF SUCCESS AND SHOWING OF IRREPARABLE HARM, THE BALANCE OF HARMS FAVORS PLAINTIFFS.

The balance of harm also favors an injunction. Plaintiffs' interest in avoiding interference with their basic free speech rights easily outweighs the City's interest in enforcing new, presumptively unconstitutional ordinances. *See ACLU v. Johnson*, 194 F.3d 1149, 1163

(10th Cir. 1999) ("[T]he threatened injury to Plaintiffs' constitutionally protected speech outweighs whatever damage the preliminary injunction may cause [to] Defendants' inability [sic] to enforce what appears to be an unconstitutional statute."); *Wagner*, 100 F. Supp. 2d at 87 (balance of harms favored injunction where plaintiff's speech would be deterred absent injunction); *Elam Constr. v. Reg'l Transp. Dist.*, 129 F.3d 1343, 1347 (10th Cir. 1997) ("RTD's asserted interest in preventing corruption, in light of its use of an impermissible restriction on speech, does not outweigh the harm asserted by plaintiffs.").

## IV.  AN INJUNCTION SERVES THE PUBLIC INTEREST.

Lastly, the issuance of an injunction will serve the public interest because Plaintiffs have demonstrated that the challenged ordinances unconstitutionally restrict speech.  As the court held in *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, "[p]rotecting rights to free speech is *ipso facto* in the interest of the general public."  249 F. Supp.2d 98, 128 (D. Mass. 2003); *see also Elam Constr.*, 129 F.3d at 1347 ("The public interest also favors plaintiffs' assertion of their First Amendment rights.").  The issuance of an injunction here not only protects *Plaintiffs'* rights to free speech, but also the rights of others whose speech may also be chilled by the challenged ordinances.  *See Johnson*, 194 F.3d at 1163 (injunction would "protect the free expression of the millions of Internet users both within and outside the State of New Mexico").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court grant a preliminary injunction prohibiting the City from enforcing R.O. c. 9, §16 and R.O. c. 13, § 77(a).

Respectfully submitted,

ROBERT THAYER, SHARON BROWNSON, and
TRACY NOVICK,

By their attorneys,


/s/ Kevin P. Martin
Kevin P. Martin (BBO# 655222)
Yvonne W. Chan (BBO# 669223)
Todd Marabella (BBO# 682525)
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts  02109
Tel.:  617.570.1000
Fax.:  617.523.1231
KMartin@goodwinprocter.com
YChan@goodwinprocter.com
TMarabella@goodwinprocter.com

Matthew R. Segal (BBO# 654489)
Sarah R. Wunsch (BBO# 548767)
American Civil Liberties Union
  of Massachusetts
211 Congress Street
Boston, Massachusetts 02110
Tel.: 617.482.3170
Fax.: 617.451.0009
MSegal@aclum.org
SWunsch@aclum.org


Dated:   May 13, 2013