## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ROBERT THAYER, SHARON BROWNSON, and  TRACY NOVICK, | ) ) ) | |
| Plaintiffs, | ) ) | **CIVIL ACTION** |
| v. | ) ) | **No. 13-40057-TSH** |
| CITY OF WORCESTER, | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OF DECISION AND ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Docket No. 2).**
**October24 , 2013**

**Hillman, D.J.**

### Nature of  The Case

In January of 2013, the City of Worcester ("City") adopted two ordinances aimed at controlling aggressive panhandling.   Specifically, the City of Worcester Revised Ordinances of 2008, as amended through February 5, 2013 ("R.O.") ch. 9, § 16 ("Ordinance 9-16")  makes it " ... unlawful for any person to beg, panhandle or solicit in an aggressive manner."  R.O.  ch. 13, § 77(a)("Ordinance 13-77") prohibits standing or walking on a traffic island or roadway except for the purpose of crossing at an intersection or crosswalk, or entering or exiting a vehicle or "for

some other lawful purpose."[1] On May 31, 2013, the Plaintiffs brought suit against the City

seeking declaratory and injunctive relief and monetary damages.  On June 10, 2013, I held a

hearing on the Plaintiffs' request for a preliminary injunction.  For the reasons set forth below, I

deny that motion.

### Background Facts

In 2005, the City implemented an action plan to reduce the incidents of panhandling in

the City.  That plan contemplated public education, increased involvement by social service

agencies and treatment providers, and enforcement strategies.  It also featured billboards which

read "Panhandling is not the solution" in an effort to discourage the citizenry from giving money

directly to panhandlers instead of an appropriate social service agency. *See Complaint*, at *Ex. 1.*

For reasons that are unclear, that plan languished until 2012 when the City sought guidance from

City Manager Michael O'Brien ("City Manager O'Brien") on how to implement a new strategy

to reduce panhandling throughout the City.  In a July 12, 2012, communication to the City

Council, City Manager O'Brien reported that: "[t]here is no current mechanism for tracking or

compiling statistics on panhandling or its impact on the community by the City or any of our

community partners or local social service agencies." *Id.*, at *Ex. 2* ("*July Memorandum*").  He

suggested that the solution should involve a "multi-faceted, community-wide response that

incorporates direct service providers, non-profit agencies, area businesses, policymakers, and

public services." *Id.*  He also related a Department of Justice caution that "'law enforcement

alone is seldom effective in reducing or solving the problem.'" *Id.*

As part of his analysis of the problem, City Manager O'Brien acknowledged that peaceful

panhandling is constitutionally protected speech under the First Amendment to the Constitution.

However, City Manager O'Brien pointed out that incidents of aggressive panhandling may be

---

[1]  The text of the ordinances can be found in the *Appendix* attached hereto,

proscribed by state law.   He noted that between January 2011 and January 2012, City Police were dispatched to 181 incidents of aggressive behavior by individuals who may have been panhandling resulting in five arrests.   *Id.*

On October 30, 2012, City Manager O'Brien followed up his *July Memorandum* by announcing the results of a City led "data collection effort ... to understand and assess the scope of panhandling" in the City. *See Complaint*, at *Ex. 3*. That data collection effort compiled the results of outreach by an experienced social worker who, along with 16 case workers, engaged 38 panhandlers.   In furtherance of the goal to understand and assess the scope of panhandling, these individuals worked with panhandlers for purposes of educating them about resources and services available to them. *Id.*  For example, the outreach worker referred some of the panhandlers to housing and financial assistance programs and others to mental health and substance abuse treatment services.   City Manager O'Brien stressed the importance of the outreach efforts because "it takes time to work with routine panhandlers in order to effectively change their behavior pattern and develop service plans in conjunction with their existing providers." *Id.*  On the record before me, it is unclear whether the City is continuing these outreach efforts.

 In addition to touting the value of engagement, education, and connection with services, City Manager O'Brien also opined that the practice of soliciting for donations by walking in and out of traffic is inherently dangerous and needed regulation.  *Id.* The two ordinances which are the subject of this lawsuit were passed to address these concerns. Specifically, Ordinance 9-16 regulates the time, place, and manner of panhandling by outlawing "aggressive panhandling and solicitation."  Ordinance 13-77 prohibits standing or walking on a traffic island or roadway

except for the purposes of crossing at an intersection or crosswalk, for the purpose of entering or exiting a vehicle or "for some lawful purpose."

In a lesson on the law of unintended consequences, Ordinance 13-77, while preventing panhandling on public streets and intersections, also serves to prohibit tag day fundraisers and political speech much to the dismay of local charities, civic organizations youth sports teams, and politicians running for office. Concerns about these unintended consequences were raised during the City Council debate on the passing of the then proposed ordinances. Also raised was the concern that these ordinances were unnecessary because existing laws already serve to regulate the aggressive behavior which the proposed ordinances targeted. *See Decl. of Todd Marabella* (Docket No. 4)("*Marabella Decl.*"), at *Ex. 9* (audio file of November 13, 2013 Worcester City Council Meeting) and *Ex. 10* (unofficial transcript of November 13, 2013 Worcester City Council Meeting)(together, "*City Council Meeting Tr.*"). Although some City Councilors voiced opinions suggesting that the purpose of these ordinances was primarily to eradicate panhandling in the City, Mayor Petty emphasized that in his mind, the purpose of the proposed ordinances was to address a "purely a public safety issue." *Id.*

On March 20, 2013, the Worcester Telegram & Gazette reported that four people had been arrested in March for violating Ordinance 9-16; one of them was arrested twice. *Id.*, at *Ex. 12*. According to the article, the individuals were given multiple warnings about the new ordinance prohibiting aggressive panhandling before being arrested. *Id.* No incidents of arrest for violation of Ordinance 13-77 have been brought to the Court's attention.

## Discussion

In determining whether to issue a preliminary injunction, the Court must weigh four

factors:

> '(1) the likelihood of success on the merits; (2) the potential for irreparable harm
> if the injunction is denied; (3) the balance of relevant impositions, *i.e.*, the
> hardship to the nonmovant if enjoined as contrasted with the hardship to the
> movant if no injunction issues; and (4) the effect (if any) of the court's ruling on
> the public interest.'

*Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 162 (1ˢᵗ Cir. 2004)(citation to

quoted case omitted).  "The sine qua non of this four-part inquiry is likelihood of success on the

merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the

remaining factors become matters of idle curiosity." *New Comm. Wireless Services, Inc., v.*

*SprintCom, Inc.,* 287 F.3d 1, 9 (1ˢᵗ Cir. 2002)..

### *Standing*

As a preliminary matter, the Defendants argue that Plaintiffs have no likelihood of

success on the merits because they lack standing to maintain the suit.  The Plaintiffs, Robert

Thayer and Sharon Brownson, are individuals who regularly solicit donations.  The Plaintiff,

Tracy Novick, is a Worcester School Committee member who has regularly stood on median

strips and traffic circles within the city holding campaign and political signs.  Each of these

Plaintiffs has filed an affidavit in support of their application for injunctive relief. The City

argues that since the Plaintiffs have not been arrested, their challenge is a facial challenge of the

ordinance rather than an "as applied" challenge.  They posit that the Plaintiffs have not shown an

objectively reasonable possibility that the ordinance would be applied to their activities.

"The necessity to establish constitutional standing is rooted in the case or controversy

requirement of the Constitution. '[T]he standing question is whether the plaintiff has "alleged

such a personal stake in the outcome of the controversy" as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf.'" *See Mangual v. Rotger-Sabat*, 317 F.3d 45, 56 (1st Cir. 2003) (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197 (1975)); *see also* U.S. Const. art. III, § 2.  "For standing to challenge the constitutionality of a particular municipal ordinance  ...  plaintiffs [must] show an objectively reasonable possibility that the ordinance would be applied to their own activities." *Sullivan v. City of Augusta*, 511 F.3d 16, 25 (1st Cir. 2007)(*citing Osediacz v. City of Cranston*, 414 F.3d 136, 143 (1st Cir.2005)).

That the Plaintiffs have not been arrested for violating either ordinance does not preclude a finding that  they have the requisite standing to mount their claims. *See Mangual,* 317 F.3d at 56  ( "[a] party need not violate the statute and suffer the penalty in order to generate a conflict worthy of standing in federal court"); *see also Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393, 108 S.Ct. 636 (1988)(plaintiff who challenges statute must demonstrate realistic danger of sustaining direct injury as result of its operation or enforcement, but  does not have to await consummation of threatened injury to obtain preventive relief-- if injury is certainly impending, that is enough)). Where a litigant seeks to challenge governmental action as violative of the First Amendment, two types of injuries may confer Article III standing without necessitating that the challenger have been subjected to criminal prosecution. The first is when "the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 230 (1979).  Such Plaintiffs may have standing even if they have never been prosecuted or threatened with prosecution. *Doe v. Bolton*, 410 U.S. 179, 188, 93 S.Ct. 739 (1973); *see also Steffel v.*

*Thompson*, 415 U.S. 452, 462, 94 S.Ct. 1209 (1974)(plaintiffs need not place themselves "between the Scylla of intentionally flouting state law and the Charybdis of forgoing ... constitutionally protected activity").   The second type of injury is when "the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences.  In such situations the vice of the statute is its pull toward self-censorship" *N.H. Right to Life PAC v. Gardner,* 99 F.3d  8, 13-14 (1st Cir. 1996)(internal citation omitted).

Both types of cases "hinge on the existence of a credible threat that the challenged law will be enforced. If such a threat exists, then it poses a classic dilemma for an affected party: either to engage in the expressive activity, thus courting prosecution, or to succumb to the threat, thus forgoing free expression. Either injury is justiciable. Conversely, if no credible threat of prosecution looms, the chill is insufficient to sustain the burden that Article III imposes. A party's subjective fear that she may be prosecuted for engaging in expressive activity will not be held to constitute an injury for standing purposes unless that fear is objectively reasonable." *Id.* at 14.

All three Plaintiffs have acknowledged engaging in conduct that would be proscribed under the ordinances.  Both Mr. Thayer and Ms. Brownson step into the street occasionally to receive contributions from passing motorists and both have been warned by the police to stop soliciting on City sidewalks or face arrest.  Ms. Novick represents that she and her campaign workers regularly hold signs on medians and traffic islands and that she now fears that she will be arrested for this conduct.  There can be no doubt that should Mr. Thayer and Ms. Browning continue to engage in the conduct they describe, they would be subject to arrest.  Indeed, City police officers have arrested individuals who have engaged in similar conduct after receiving

prior warnings.  Therefore, as to them, the threat is objectively real and I find that they have

standing to challenge Ordinance 9-16.

      With respect to Ms. Novick, it is a closer call.  Persons violate Ordinance 13-77 only if

they refuse to move along after being advised to do so by a police officer.  At a meeting of the

Worcester Joint Public Health & Human Services and Municipal Operations Committee, the City

Solicitor indicated that Ordinance 13-77 was worded in such a way as to give police officers

discretion regarding its enforcement.  If a person or people are congregated on a traffic island or

median and do not pose a threat to public safety, then the officer would have the discretion to

allow the person(s) to remain. *See Marabella Decl.,* at *Ex. 11* (audio file) and *Ex. 12* (unofficial

transcript).  Ms. Novick is currently seeking re-election to the Worcester School Committee and,

as she has in past elections, would like to be able to stand on a traffic island or median strip with

supporters holding signs to be viewed by passing motorists.  Such activity is squarely within the

conduct that the Ordinance 13-77 is intended to prohibit.  The question becomes whether there is

a credible threat of injury to  Ms. Novick, *i.e.* whether the ordinance is likely to be enforced

against her.  Under the circumstances, I find it objectively reasonable to fear that the police

would deem such activity as distracting to drivers and therefore, to constitute a public safety

issue warranting enforcement of the ordinance. Therefore, I find that Ms. Novick has standing to

challenge Ordinance 13-77. *Accord Mangual*, 317 F.3d  at 57 (while a plaintiff's subjective fear

of prosecution is insufficient to confer standing, the evidentiary bar which must be met is very

low and courts will assume a credible threat of prosecution absent compelling evidence to

contrary); *see also Sugarman v. Village of Chester*, 192 F.Supp.2d 282, 289 (S.D.N.Y.

2002)(plaintiff had standing to assert facial challenge to sign ordinance where she voluntarily

complied with ordinance rather than risk enforcement and negative publicity; this is type of self-censorship that led courts to relax traditional standing requirements).

### *The Likelihood of Success on the Merits*

#### <u>*What level of scrutiny to employ?*</u>

Soliciting contributions is expressive activity that is protected by the First Amendment. In *Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 100 S.Ct. 826 (1980), the United States Supreme Court struck down an ordinance prohibiting solicitations by charitable organizations that did not use at least seventy-five per cent of their revenues for charitable purposes. The Court reaffirmed that "charitable appeals for funds, on the street or door to door, involve a variety of speech interests-communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes-that are within the protection of the First Amendment.... [S]olicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political or social issues, and ... without solicitation the flow of such information and advocacy would likely cease." *Id*. at 632, 100 S.Ct. 826; *see also United States v. Kokinda*, 497 U.S. 720, 725, 110 S.Ct. 3115 (1990)(solicitation is recognized form of speech protected by First Amendment); *Benefit v. City of Cambridge*, 424 Mass. 918, 922-23, 679 N.E.2d 184, 187-88 (1997)(same).  Furthermore, it is black letter law that political speech of the type in which Ms. Novick seeks to engage, *i.e.,* she and her supporters holding up political signs and waving to passing motorists and pedestrians, is speech which is afforded the strongest protection under the First Amendment. *See Long Beach area Peace Newtwork v. City of Long Beach*, 574 F.3d 1011, 1021  (9th Cir. 2009)(political speech is core First Amendment speech critical to function of our democratic system).

Because the activities in which the Plaintiffs seek to engage are protected speech, the Court's first task is to determine what level of judicial scrutiny to apply in this case. "The Supreme Court has established different levels of scrutiny for analyzing alleged First Amendment violations, depending on where the speech takes place. In traditional public fora, 'the government's ability to permissibly restrict expressive conduct is very limited.' In such locations, First Amendment protections are strongest and regulation is most suspect." *Id.* (internal citations and citation to quoted case omitted). Since in this case, Plaintiffs "seek to engage in protected speech in … [areas recognized as traditional public forums, namely city sidewalks, street, traffic islands and medians,] the government's power to regulate that speech is limited, though not foreclosed." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 555 (4th Cir. 2013)[2]; *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948 (1983)(in places which by long tradition or government fiat have been devoted to assembly and debate, rights of government to limit expressive activity are sharply circumscribed; at one end of spectrum are streets and parks which are quintessentially public forums.) "In a traditional or designated public forum, content-neutral restrictions on the time, place, and manner of expression must be narrowly tailored to serve some substantial governmental interest, and

---

[2] There may be some question as to whether a median strip or traffic island is a traditional public forum. Many of the median strips and traffic islands in question are parts of the public thoroughfare and have long been utilized by politicians and others to express their views—whether with the express or tacit approval of the City-- and therefore, if not traditional public forums arguably fall into the category of designated public forums, *i.e.*, public property which has been opened for use by the public as a place to express activity. *Accord Warren v. Fairfax County,* 196 F.3d 186 (4th Cir. 1999)(en banc)(dicta). The government may rescind the open character of such property, but while open to the public, designated public forums are afforded the same scrutiny as traditional public forums. On the other hand, many of the medians and islands specifically cited by the Plaintiffs are in the middle of public roadways, with limited access and sidewalks and no benches or similar amenities which would suggest that they are intended to be used by the public. Lesser scrutiny is applied to restrictions imposed on government property which constitutes a non-public forum. Because I find that the Ordinance 13-77 withstands Plaintiffs' challenge even under the heightened standard afforded public forums, it is not necessary for me to resolve this issue. For a detailed discussion of the issue of whether medians and the like should constitute traditional public forums, *see Satawa v, Macomb County Road Com'n,* 689 F.3d 506 (6th Cir. 2012)(finding highway median was traditional public forum: median had no parking spaces or public restrooms, but public had been allowed to use it for variety of expressive purposes, there are benches on the median, a pedestrian sidewalk provides access, and memorial plaques are displayed thereon).

must leave open adequate alternative channels of communication." *New England Re'l Council of Carpenters v. Kinton*, 284 F.3d 9, 20 (1st Cir. 2002).  Moreover, "viewpoint-based restrictions are prohibited, and any content-based restriction must satisfy strict scrutiny, but reasonable time, place, and manner limitations are permissible." *Watchtower Bible and Tract Soc. of New York, Inc. v. Sagardia De Jesus*, 634 F.3d 3, 11 (1st Cir. 2011).

### Content-Based Versus Content-Neutral Speech

"The First Amendment generally prevents government from proscribing speech … because of disapproval of the ideas expressed.  Content-based regulations are presumptively invalid. " *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382, 112 S. Ct. 2538, 2542 (1992). However, "even so precious a freedom must, in particular iterations, be balanced against the government's legitimate interests in protecting public health and safety". *McCullen v. Coakley*, 571 F.3d 167, 175 (1st Cir. 2009)(citing *Schenck v. United States*, 249 U.S. 47, 52, 39  S.Ct. 247 (1919) ("The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre.")).

> In striking this delicate balance, a court must calibrate the scales differently depending on the nature of the governmental action. That calibration takes place along a continuum. At one end of the continuum are laws in which the government attempts to differentiate between divergent views on a singular subject; that is, laws in which the government attempts to 'pick and choose among similarly situated speakers in order to advance or suppress a particular ideology or outlook.' Such viewpoint-based discrimination is highly offensive to the core values of the First Amendment, and courts are wary of such encroachments. … Further along the continuum are laws that do not regulate speech per se but, rather, regulate the time, place, and manner in which speech may occur such as the ordinances in question. Because such time-place-manner restrictions are by definition content-neutral, they tend to burden speech only incidentally; that is, they burden speech for reasons unrelated to either the speaker's viewpoint or the speech's content. Regulations of this type will be upheld as long as 'they are justified without reference to the content of the regulated speech, ... are narrowly tailored to serve a significant governmental interest, and ... leave open ample alternative channels for communication of the information.' This more relaxed standard, familiarly known as 'intermediate scrutiny,' is justified because the fact that a regulation is both content-neutral and viewpoint-neutral helps to ensure that

> government is not using the regulation as a sub rosa means of interfering in areas to which First Amendment protections pertain.

*Id.* (internal citations and citation to quoted cases omitted); s*ee also  Frisby v. Schultz*, 487 U.S. 474, 481, 108 S.Ct. 2495 (1988)("[T]he appropriate level of scrutiny is initially tied to whether the statute distinguishes between prohibited and permitted speech on the basis of content"); *Clatterbuck*, 708 F.3d at 555.

The Plaintiffs allege that the ordinances are content-based and that I must apply strict scrutiny.   Not surprisingly, the Defendants say that they content-neutral and thus entitled to intermediate scrutiny. If the ordinance is content-based, the ordinance will survive only if it is the least restrictive means available of furthering a compelling government interest. If I find that the ordinance is content neutral, then the Court's inquiry is limited to whether the ordinances: (1) possess adequate standards to guide the exercise of official discretion, and (2) are narrowly tailored to a significant government interest while leaving open satisfactory alternative means of communication. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746 (1989).

### *Do the ordinances satisfy the test for content-neutrality?*

The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 295, 104 S.Ct. 3065 (1984). The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. *See Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48, 106 S.Ct. 925 (1986). *Ward*, 491 U.S. at 791, 109 S.Ct. 2746.  For the reasons set forth below, I find that the ordinances in question are content-neutral.

The restrictions imposed on speech by the ordinances apply with equal force without regard to message.  Thus, Ordinance 9-16 prevents all individuals from *aggressively* soliciting funds on streets, highways, sidewalks, walkways, plazas and other public venues within the City whether they be panhandlers or belong to political groups, religious organizations, charities, civic organizations, youth sports teams, *etc*.  More specifically, all individuals are banned from: asking for money as well as objects or other things of any value; and from using the spoken or written word, bodily gestures, signs or other means of communication in order to obtain donations of money or other things of value and to offer to exchange and/or sell any goods or services.  Similarly, Ordinance 13-77 applies to anyone, regardless of message, who stands on a traffic island or roadway except for the purposes of crossing at an intersection or crosswalk, for the purpose of entering or exiting a vehicle or "for some lawful purpose."   While it appears that to date only panhandlers have been arrested for violating either of the ordinances (specifically, Ordinance 9-16), there is no evidence that the ordinances have not been applied evenhandedly— that is, there is no evidence that anyone other than panhandlers have violated either ordinance and not been arrested.   Because I find that the ordinances do not distinguish between types of speech,  I find that they are content-neutral.

*Are the Ordinances Narrowly Tailored to a Significant Government Interest while Leaving Open Satisfactory Alternative Means of Communication*

In determining whether Ordinance 9-16 is narrowly tailored to serve the governmental interest at stake, the preamble attempts to justify the legislative balancing of the right to exercise First Amendment freedoms, against the rights of the City to impose reasonable time, place, and manner restrictions on panhandling.  That preamble states that: "[p]ersons approached by individuals asking for money, objects or other things of any value are particularly vulnerable to real, apparent or perceived coercion when such request is accompanied by, or immediately

followed or preceded with, aggressive behavior." *Ordinance 9-16*, at ¶ (a)(3). While this statement of purposes is somewhat self-serving it does establish the ostensible reason for enacting the ordinance. It also is responsive to City Manager O'Brien's report that, during calendar year 2011, Worcester Police were dispatched to 181 incidents of aggressive behavior by individuals who may have been panhandling.

In the case of *Clatterbuck*, the Fourth Circuit reversed the lower court's grant of a Rule 12(b)(6) motion to dismiss a challenge to an ordinance forbidding soliciting in a particular part of the City of Charlottesville. The court pointed out that:

> The Ordinance does not contain a statement of purpose, and no evidence is properly before us to indicate the City's reason or reasons for enacting the Ordinance. To be sure, the City has advanced some plausible arguments that it enacted the Ordinance without any censorial purpose and with a compelling, content-neutral justification. These rationales additionally find support in First Amendment jurisprudence.
> Without any facts before us pertaining to the government's reasons for enacting the Ordinance, however, forming conclusions about these asserted purposes becomes mere conjecture.

*Clatterbuck*, 708 F.3d at 559 (internal citations omitted); *see, also Kokinda*, 497 U.S. at 733–36, 110 S.Ct. 3115.

The Supreme Court has held that a municipality's "own implementation and interpretation" of an ordinance may be considered when evaluating a facial challenge. *Forsyth County, Georgia v. Nationalist Movement*, 505 U.S. 123, 131, 112 S.Ct. 2395 (1992). Although the Supreme Court has not specifically delineated what facts a court should consider to discern the municipality's intentions, in at least one case the Court examined a preamble for clarification about the purposes of an ordinance. *See City of Newport, Kentucky v. Iacobucci*, 479 U.S. 92, 96-97, 107 S.Ct. 383 (1986)(summary disposition); *see also URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 14 (1st Cir. 2011) ("The Supreme Court has looked to an ordinance's preamble to ascertain what activity it was intended to prohibit.").

14

The Courts of Appeal have followed suit in determining that preamble language can assist their understanding of a statute or ordinance.  *See, e.g., Ass'n of Am. Railroads v. Surface Transp. Bd.*, 237 F.3d 676, 681 (D.C.Cir. 2001) (citing *Wyoming Outdoor Council v. United States Forest Serv.*, 165 F.3d 43, 53 (D.C.Cir. 1999) ("[A]lthough the language in the preamble of the statute is 'not an operative part of the statute,' it may aid in achieving a 'general understanding' of the statute.")); *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 723 n. 28 (7th Cir. 2003) (noting that when federal courts evaluate the "predominant concerns" motivating the enactment of a statute or ordinance, they may look at materials including "any preamble or express legislative findings associated with it").  The First Circuit has utilized these principles as well; in *URI Student Senate* the court analyzed the preamble of an ordinance that allowed police to mark noisy houses with an "x," in order to determine whether the ordinance was unconstitutionally vague.  *See*  at *URI Student Senate, 631 F.3d* at 14.

One  Eleventh Circuit case, *Wise Enterprises, Inc. v. Unified Government of Athens-Clarke County, Georgia*, 217 F.3d 1360 (11th Cir. 2000), is instructive with respect to the weight and use a court may allot to preamble language.   In that case, the appellant ran an adult entertainment establishment that was negatively affected by an Athens-Clarke County's ban on nude barroom dancing in establishments serving alcoholic beverages.  *See id.* at 1362.  After determining that the ordinance should be considered content-neutral, the Eleventh Circuit then applied the intermediate scrutiny test set forth in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673 (1968) to assess the ordinance's validity.  The second prong of that test required the court to analyze whether "the ordinance furthers [a substantial interest]."  *Id.* at 1364.  The court recognized that for the "[Athens-Clarke] County to meet its burden under this element, it must have '*some* factual basis for the claim that [adult] entertainment in establishments serving

alcoholic beverages results in increased criminal activity.'" *Id.* (citation to quoted case omitted; emphasis in original). Consequently, the court turned to statements in the preamble to the ordinance, which established that the County had made findings that such behavior often led to increased criminal behavior, depression of property values, increased use of law enforcement personnel, and acceleration of community blight. *Id.* at 1363-64 (quoting Athens-Clarke County Code § 6-11 (1997)). The preamble language, together with minutes of a county commission meeting that had been provided to the court, established that "the County's enactment of the ordinance was based upon the experiences of other urban counties and municipalities, copies of studies from other jurisdictions examining the problems associated with public nudity in conjunction with the sale of alcohol, and a review of information received by the Athens-Clarke County Police Department detailing visits to adult entertainment establishments in the County." *Id.* at 1364. Accordingly, the Eleventh Circuit concluded that "the County had a reasonable basis for believing the ordinance would sufficiently further its interests." *Id.*

While I appreciate and understand that legislative preambles are necessarily self-serving, I nevertheless give them credibility in determining that the restrictions on speech in the ordinances are narrowly tailored to serve the governmental interest. This is particularly true in this case where the minutes of meetings involving City Council members present somewhat of a mixed bag. In discussing Ordinance 9-16, some City councilors were clearly concerned with the safety and welfare of both those individuals engaged in solicitation as well as members of the public being solicited; at the same time, the primary concern of other councilors appeared to be that panhandling was a blight on the City which should be eliminated at all costs. As to Ordinance 13-77, the primary concern of the City Council appeared to be the safety and welfare of the public. *See generally City Council Meeting Tr.*

16

The City has a legitimate interest in promoting the safety and convenience of its citizens on public sidewalks and streets.  *See Madsen v. Women's Health Center*, 512 U.S. 753, 768, 114 S.Ct. 2516, (1994) ("State  also has a strong interest in ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks ..."); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650, 101 S.Ct. 2559 (1981) (recognizing state interest in safety and convenience of citizens using public fora); *Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762 (1941) (recognizing state interest in safety and convenience on public roads); *Ayres v. City of Chicago*, 125 F.3d 1010, 1015 (7th Cir.1997) ("There are unquestionable benefits from regulating peddling, First Amendment or otherwise, [including] … the control of congestion."). Additionally, a government regulation can be considered narrowly tailored " 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward*, 491 U.S. at 799, 109 S.Ct. 2746 (citation to quoted case omitted). This means the regulation need not be a perfect fit for the government's needs, but cannot burden substantially more speech than necessary. *Id.* at 800, 109 S.Ct. 2746. Furthermore, a time, place or manner restriction need not be the least restrictive means of achieving the government purpose, so long as it can be considered narrowly tailored to that purpose. *Id.* at 798, 109 S.Ct. 2746.  *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000).

I find that both ordinances are narrowly tailored to achieve their intended purposes: Ordinance 9-16 bans only aggressive forms of solicitation—those which are most likely to result in possible violent confrontation, that are most likely to  intimidate those being solicited and  that are most likely to endanger the solicitor and/or members of the general public.  Ordinance 13-77 essentially bans people from congregating and/or loitering on traffic islands, medians and other

like public ways under circumstances where such conduct could prove distracting to drivers and pedestrians.

Finally, the ordinances also leave open ample alternative channels for communication. Worcester has determined that vocal requests for money create a threatening environment, or at least a nuisance for some citizens. The City has chosen to restrict soliciting only in those circumstances where it is considered especially unwanted or bothersome; at night, around banks, in lines for theatre, etc. Further, they have determined that the solicitation of funds by stepping into the street is inherently dangerous and that any standing or walking on a traffic island or roadway except for the purposes of crossing is likewise dangerous. Hopefully, we are all in agreement that the act of stepping into traffic to solicit or receive a donation is dangerous does not require empirical evidence or a "body count."

That Ordinance 13-77 prohibits not just solicitation, but political and other protected types of speech in a rotary, traffic island or crosswalk was the cause of much discussion in the City Council. One of the most vibrant displays of democracy in action takes place during rush hour and on Saturday mornings at election time. The cacophonous political sign holders that populate the rotaries, traffic islands, and intersections of our communities represent the electoral process in full bloom. They are colorful, persistent, and, at times distracting. Rotaries and traffic islands are especially attractive venues for both political sign holders and those seeking to solicit for funds because of their clear sight lines and heavy traffic. They are also dangerous exercises in survival driving skills.[3] At the same time, politicians and others with messages to

---

[3] The Urban Dictionary definition of Kelley Square: "A large deathtrap in Worcester, MA consisting of two rotaries and several roads intersecting them. Only the bravest of the brave and/or the craziest of the crazy should even attempt to drive through it."

spread are not banned from utilizing other public forums, such as sidewalks (so long as they don't wander into traffic), and parks (presuming they are properly permitted, if required).

### *Whether the Ordinances Are Unconstitutionally Vague*

Plaintiffs assert that the ordinances fail to meet the requirements of the Due Process Clause of the Fourteenth Amendment in that they are so vague and standardless that they leave the public uncertain as to the conduct prohibited.  More particularly, Plaintiffs argue that the ordinances fail to adequately define the conduct which is prohibited.  I disagree.

> 'It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.' ... 'For such a facial challenge to succeed, however, the complainant must demonstrate that the law is impermissibly vague in all of its applications.'
> To comport with the strictures of due process, a law must define an offense  ' "[1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." The void-for-vagueness doctrine embraces these requirements.' Nevertheless, words are rough-hewn tools, not surgically precise instruments. Consequently, some degree of inexactitude is acceptable in statutory language. Consistent with this reality, ' "the fact that a statute requires some interpretation does not perforce render it unconstitutionally vague." It follows that 'reasonable breadth' in the terms employed by an ordinance does not require that it be invalidated on vagueness grounds.

*URI Student Senate*, 631 F.3d at 13-14.

The Plaintiffs strained arguments in support of their attempt to challenge the ordinances on vagueness grounds are at best, disingenuous; therefore, a protracted discussion of this issue is simply not warranted.  Ordinance 9-16 in particular goes into exacting detail about what type of conduct is prohibited and both ordinances adequately define as well as the types of public areas as to which they apply, *i.e.*, sidewalks,  traffic islands, medians, etc.   Furthermore, the preamble to Ordinance 9-16 provides additional  guidance for determining was activity is and is not permitted. *See URI Student Senate*, 631 F.3d at 14; *see also Ass'n of Am. Railroads,* 237 F.3d  at 681; *Wyoming Outdoor Council,* 165 F.3d at 53 (preamble of  statute may aid in determining its

general).  I am also unpersuaded by Plaintiffs' argument that the ordinances' language and

enforcement provisions are vague because they allow the police seemingly unfettered discretion

as to what constitutes a violation of the ordinance, and whether to make an arrest for violating its

terms.  This argument bootstraps on Plaintiffs' argument that the ordinances do not sufficiently

define what conduct is prohibited.  In other words, Plaintiffs argue that the police have unfettered

discretion in enforcing the ordinances because the ordinances are unclear as to what conduct is

prohibited.  I have found that the ordinances provide concrete guidance as to the type of conduct

prohibited, which informs both their enforcement by police and any subsequent prosecution:

"[t]he bottom line is that, viewed in context, it is clear what conduct the [ordinances] as a whole

forbid[].  Taken together, [the ordinances definition of what constitutes an offense thereunder],

the list of examples of [conduct] that might serve as such a predicate to police intervention

included in the [ordinances]," and the City's reasons for enacting the ordinances, "provide

sufficient enforcement guidance to the police and adequately types of behavior prohibited." *URI
Student Senate*, 631 F.3d at 15.

*Whether the Ordinances Discriminate Against the Poor*

Plaintiffs assert that the ordinances violate the Equal Protection Clause of the Fourteenth

Amendment because they discriminate against the poor and homeless. In support, the Plaintiffs

argue that although they purport to apply to anyone who engages in prohibited activities, the

evidence is they target the poor and homeless.

"The Equal Protection Clause protects against invidious discrimination among similarly

situated individuals or implicating fundamental rights. The threshold element of an equal

protection claim is disparate treatment; once disparate treatment is shown, the equal protection

analysis to be applied is determined by the classification used by government decision-makers.

20

Strict scrutiny is appropriate only if a classification infringes on a class of people's fundamental rights or targets a member of a suspect class. When government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized. Under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Speet v. Schuette*, 889 F. Supp. 2d 969, 978-79 (W.D. Mich. 2012) *aff'd,* 726 F.3d 867 (6th Cir. 2013)(internal quotations and citations omitted).

The preamble to Ordinance 9-16 and the minutes of the City Council meeting suggest that the ordinances were enacted for health and safety reasons and, in part, to eliminate the incidents of panhandling within the City.  At the same time, those sources also make clear that the City Council recognized that the ordinances would be applied evenhandedly to all individuals engaging in such conduct, including, without limitation, politicians, members of religious organizations, and members of charitable organizations. While it is true that enforcement of the ordinances *may* end up having a disproportionate affect on the poor and homeless, I do not find that Plaintiffs have evidenced a likelihood of establishing that the City's actions have been taken "with an evinced intent to discriminate against an identifiable group." *Joyce v. City and County of San Franciso*, 846  F.supp. 843, 858 (N.D. Cal. 1994).

For the reasons set forth above, I find that the Plaintiffs have failed to establish a likelihood that they will succeed on the merits of their claims.

### *Irreparable Harm*

In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis. As the Supreme Court has explained, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673 (1976); *see also Asociación de Educación Privada de Puerto Rico, Inc. v. García–Padilla*, 490 F.3d 1, 21 (1st Cir.2007) (applying *Elrod* to irreparable harm component of permanent injunction analysis); *Maceira v. Pagan*, 649 F.2d 8, 18 (1st Cir.1981) ("It is well established that the loss of first amendment freedoms constitutes irreparable injury."). Accordingly, irreparable injury is presumed upon a determination that the movants are likely to prevail on their First Amendment claim. *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10-11 (1st Cir. 2012). I have found that there is little likelihood of success on the merits and therefore, will not presume irreparable harm. I additionally find that the Plaintiffs will not suffer irreparable harm. Those that would solicit for funds will not suffer lost opportunity as Plaintiffs suggest. Their opportunities are simply proscribed as to time, place, and manner. Plaintiff, Novick, will still be able to campaign, just not from the medians, traffic islands or the like.

### *The Balancing of the Harms and The Public Interest*

In my analysis, I have found that the City has a legitimate reason for enacting the ordinances in question, that these interests are substantial and necessarily outweigh the Plaintiffs' interest in the unfettered right to solicit in public areas. I further find that it is in the public's interest to be safe and secure in their person, and for safety of all to be maintained on City streets, sidewalks, traffic islands and similar public areas.

## **Conclusion**

IT IS HEREBY ORDERED that:

Plaintiffs' Motion For Preliminary Injunction (Docket No. 2) is **denied**.


_**/s/ Timothy S. Hillman**_
TIMOTHY S. HILLMAN
DISTRICT JUDGE

*Appendix*

# Chapter Nine - Public Safety

§ 16.     Aggressive Begging, Soliciting and Panhandling – Ordained January 29, 2013 - 9839

(a) *Declaration of Findings and Policy.*

The city of Worcester, acting by and through its City Council, hereby makes the following findings:

(1)   The City of Worcester has a duty to protect the rights of all people to exercise their First Amendment rights safely. The City of Worcester has a compelling governmental interest in imposing certain reasonable time, place and manner regulations whenever potential First Amendment activities such as begging, solicitation and panhandling occur on streets, highways, sidewalks, walkways, plazas, and other public venues within the City;

(2)   This ordinance is not intended to limit any persons from exercising their constitutional right to solicit funds, picket, protest or engage in constitutionally protected activities. The provisions of this division are expressly established to most narrowly tailor any such restrictions to protect the First Amendment rights of all people within the City as well as the rights of non-participating people and their property, and to ensure the rights and safety of all people and/or property to the extent possible;

(3)   Persons approached by individuals asking for money, objects or other things of any value are particularly vulnerable to real, apparent or perceived coercion when such request is accompanied by or immediately followed or preceded with aggressive behavior such as:

(A) continuing to beg or solicit from a person after the person has given a negative response to such solicitation;

(B) touching another person or their property in the course of begging or soliciting without that person's consent;

(C) blocking or interfering with the safe or free passage of a pedestrian or vehicle by any means;

(D) using violent or threatening gestures which are likely to provoke an immediate violent reaction from the person who is the subject of the solicitation or request for money;

(E) closely following behind, ahead or alongside a person who has been solicited or asked for money after that person has given a negative response to such solicitation;

(F) using profane, threatening, or abusive language, either during the solicitation or begging or following a refusal;

(G) begging or soliciting money from anyone who is waiting in line for tickets, entering a public building or riding on public transportation;

(H) begging or soliciting in a manner with conduct, words or gestures intended or likely to cause a reasonable person to fear imminent bodily harm, danger or damage to or loss of property or otherwise to be intimidated into giving money or any other thing of value; or

(I) begging or soliciting in a group of two or more persons in an intimidating fashion.

(4)  The City desires to respect a person's potential right to solicit, beg or panhandle while simultaneously protecting another's right to not be unduly coerced.

(5)  The City further finds that aggressive soliciting, begging or panhandling of persons within 20 feet of any outdoor seating area of any cafe, restaurant or other business, bank, automated teller machine, automated teller machine facility, check cashing business, mass transportation facility, mass transportation stop, or pay telephone also subjects people being solicited to improper and undue influence and/or fear and should not be allowed.

(6)  Persons approaching other individuals in an aggressive manner asking for money, objects or other things of any value after dark in public places inspire alarm and fear, which coupled with the inherent difficulty of establishing identity should not be allowed.

(b) *Purpose and Intent.*

The public purpose of this ordinance is to protect the rights of all peoples to exercise their First Amendment rights as well as the people and/or property of those who chose to be non-participating.

(c) *Definitions.*

As used in this section, the following words and terms shall have the meanings indicated. The meaning of all other terms and words not specifically defined shall be their generally accepted definition:

*"Beg," "begging"* or *"panhandling"* shall be synonymous and shall mean asking for money or objects of value, with the intention that the money or object be transferred at that time, and at that place. "Solicit" or "Soliciting" shall include using the spoken, written, or printed word, bodily gestures, signs, or other means of communication with the purpose of obtaining an immediate donation of money or other thing of value the same as begging or panhandling and also include the offer to immediately exchange and/or sell any goods or services.

*"Aggressive manner"* shall mean:

(1) approaching or speaking to a person, or following a person before, during or after soliciting if that conduct is intended or is likely to cause a reasonable person to fear bodily harm to oneself or to another, or damage to or loss of property or otherwise to be intimidated into giving money or other thing of value;

(2) continuing to solicit from a person after the person has given a negative response to such soliciting;

(3) intentionally touching or causing physical contact with another person or their property without that person's consent in the course of soliciting;

(4) intentionally blocking or interfering with the safe or free passage of a pedestrian or vehicle by any means, including unreasonably causing a pedestrian or vehicle operator to take evasive action to avoid physical contact;

(5) using violent or threatening language and/or gestures toward a person being solicited, or toward their property, which are likely to provoke an immediate violent reaction from the person being solicited;

(6) following the person being solicited, with the intent of asking that person for money or other things of value;

(7) soliciting money from anyone who is waiting in line for tickets, for entry to a building or for any other purpose;

(8) soliciting in a manner with conduct, words or gestures intended or likely to cause a reasonable person to fear immediate bodily harm, danger or damage to or loss of property or otherwise be intimidated into giving money or any other thing of value;

(9) begging in a group of two or more persons in an intimidating fashion;

(10) soliciting any person within 20 feet of the entrance to, or parking area of, any bank, automated teller machine, automated teller machine facility, check cashing business, mass transportation facility, mass transportation stop, public restroom, pay telephone or theatre or place of public assembly, or of any outdoor seating area of any cafe, restaurant or other business;

(11) soliciting any person in public after dark, which shall mean the time from one-half hour before sunset to one-half hour after sunrise.

*"Automated teller machine"* shall mean a device, linked to a financial institution's account records, which is able to carry out transactions, including, but not limited to: account transfers, deposits, cash withdrawals, balance inquiries, and mortgage and loan payments which are made available to banking customers.

*"Automated Teller Machine Facility"* shall mean the area comprised of one or more automatic teller machines, and any adjacent space which is made available to banking customers during and after regular banking hours.

*"Public place"* shall mean a place to which the public has access, including, but not limited to: a place which a governmental entity has title, any street open to public use, bridge, sidewalk, walkway, driveway, parking lot, plaza, transportation facility, school, park, or playground, and the doorways and entrances to building and dwellings.

*"Bank"* shall mean the same as defined in M.G.L. c. 167, § 1.

*"Check cashing business"* shall mean the same as that defined by M.G.L. c. 169A, § 1.

(d) *Prohibited Activity.*

It shall be unlawful for any person to beg, panhandle or solicit any other person in an aggressive manner.  Any police officer observing any person violating this provision may request or order such person to cease and desist in such behavior and may arrest such person if they fail to comply with such request or order.

(e) *Penalty*

Any person found guilty of violating this subsection (d) of this ordinance shall be punished by a fine not to exceed $50.00 for each such day during which the violation is committed, continued or permitted, or, that the Court may impose such community service as it shall determine in lieu of a monetary fine.

# Chapter Thirteen - Traffic & Parking Of Motor Vehicles

## Pedestrian Control Regulations

### § 77.  Crossing Ways or Roadways

(a)  Pedestrians shall obey the directions of police officers directing traffic.  Whenever there is an officer directing traffic, or whenever there is a traffic control signal within three hundred feet of a pedestrian, no such pedestrian shall cross a way or roadway except at such controlled location.  Pedestrian crossings shall be made within the limits of marked crosswalk and as hereinafter provided. **No person shall, after having been given due notice warning by a police officer, persist in walking or standing on any traffic island or upon the roadway of any street or highway, except for the purpose of crossing the roadway at an intersection or designated crosswalk or for the purpose of entering or exiting a vehicle at the curb or for some other lawful purpose.  Any police officer observing any person violating this provision may request or order such person the remove themselves from such roadway or traffic island and may arrest such person if they fail to comply with such request or order. \***

(b)  It shall be unlawful for any person to actuate a pedestrian control signal or to enter a crosswalk unless a crossing of the roadway is intended.

**\*Amended January 29, 2013 - 9840**