**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ROBERT THAYER, SHARON BROWNSON, and TRACY NOVICK, <br>         Plaintiffs, <br><br> v. <br><br><br> CITY OF WORCESTER, <br>         Defendant. | **CIVIL ACTION** <br> **No. 13-40057-TSH** |

**MEMORANDUM OF DECISION AND ORDER**
**November 9, 2015**

**Hillman, D.J.**

**Background**

In January of 2013, the City of Worcester ("City") adopted two ordinances aimed at controlling aggressive panhandling.  Specifically, the City of Worcester Revised Ordinances of 2008, as amended through February 5, 2013 ("R.O.") ch. 9, § 16 ("Ordinance 9-16") make it " ... unlawful for any person to beg, panhandle or solicit in an aggressive manner."  R.O.  ch. 13, § 77(a)("Ordinance 13-77," and together with Ordinance 9-16, the "Ordinances") prohibits standing or walking on a traffic island or roadway except for the purpose of crossing at an intersection or crosswalk, or entering or exiting a vehicle or "for some other lawful purpose."  On May 31, 2013, the Plaintiffs, Robert Thayer ("Thayer"), Sharon Brownson ("Brownson") and Track Novick ("Novick") brought suit against the City seeking declaratory and injunctive relief and monetary damages.  On October 24, 2013, I issued an Order denying Plaintiffs' motion for a preliminary injunction. *See Mem. of Dec. and Order on Pl's Mot. for Prel. Inj.* (Docket No. 32).

Plaintiffs appealed the denial of their request for injunctive relief to the First Circuit, which affirmed my Order, except as to Ordinance 9-16's proscription on nighttime solicitation. *See Thayer v. City of Worcester*, 755 F.3d 60 (1st Cir. 2014), *vacated, Thayer v. City of Worcester*, — U.S.—, 135 S.Ct. 2887 (2015).   Plaintiffs then filed a petition for writ of certiorari seeking review in the Supreme Court of the United States.   On June 29, 2015, the petition for writ of certiorari was granted, the judgement of the First Circuit was vacated and the matter remanded for further consideration in light of *Reed v. Town of Gilbert*, 576 U.S. —, 135 S.Ct. 2218 (2015). On July 14, 2015, the First Circuit subsequently vacated its opinion and judgment and remanded the matter to this Court.  This Memorandum of Decision and Order addresses the City of Worcester's Motion for Summary Judgment (Docket No. 79) and Plaintiffs' Motion for Summary Judgment (Docket No. 82). For the reasons set forth below, judgement shall enter in favor of the Plaintiffs.

### Standard of Review

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Carroll v. Xerox Corp*., 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "'A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case." *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor

thereof. *Sensing*, 575 F.3d at 153.  The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.,* at 152.  "'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.'"  *Id.* (citation to quoted case omitted).  "'[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial." *Id.* (citation to quoted case omitted).  The nonmoving party cannot rely on "conclusory allegations" or "improbable inferences". *Id.*  (citation to quoted case omitted).  "'The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ' " *Id.* (citation to quoted case omitted).  "Cross-motions for summary judgment require the district court to 'consider each motion separately, drawing all inferences in favor of each non-moving party in turn.' " *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014)(citation to quoted case omitted).

## **Facts**

### *Enactment of the Ordinances*

The City is a municipal corporation incorporated under the laws of Massachusetts. In April 2004, the Worcester City Council ("City Council") asked the City Administration to "review ordinances adopted by other municipalities across the country to address proliferation of panhandling." In response, the City Manager[1] reported that "[c]ourts in other states have ruled

---

[1] Depending on the time frame being referenced, the "City Manager" was either Thomas Hoover or, his successor, Michael V. O'Brien, initially as acting and later as permanent City Manager.  Because the identity of the person holding the office at the time of any given event is irrelevant to the disposition of the pending issues, I will refer generally to "City Manager" rather than specify the individual in office at the time.

that antipanhandling ordinances cannot prohibit peaceful begging," but that "Massachusetts has other statutes to deal with beggars who transgress peaceful limits." He further stated that the Worcester police "have been successful in removing panhandlers from shopping centers and other private property using the laws against trespassing." He also noted that the Worcester Chief of Police, Gary J. Gemme ("Chief Gemme"), "reports that the panhandlers stand stationary out of the traveled portion of the streets."

In October 2004, the City Council again asked the City Manager "to update [it] regarding the implementation of a strategy to reduce the incidence of panhandling throughout the City of Worcester." In response, Chief Gemme sent a report to the City Manager as an "update regarding the implementation of a strategy to reduce the incidence of panhandling throughout the City of Worcester." In this letter, which the City Manager submitted to the City Council, Chief Gemme noted that "[l]aws should differentiate between *aggressive* and *all* [other] panhandling," such as "standing with a sign vs. going out in the roadway," and that the City "already [has] . . . laws" applicable to the latter conduct and "they are enforced in Worcester."

At the time the letter was written, there were several statutes and local ordinances already in existence that could have been applied to aggressive solicitation. These included the following prohibitions:

  a. A law prohibiting the stopping of a vehicle or "accosting" the occupant of a vehicle for purposes of solicitation. *See* Mass. Gen. Laws ch. 85, § 17A ("Whoever, for the purpose of soliciting any alms, contribution or subscription or of selling any merchandise, except newspapers, or ticket of admission to any game, show, exhibition, fair, ball, entertainment or public gathering, signals a moving vehicle on any public way or causes the stopping of a vehicle thereon, or accosts any occupant of a vehicle stopped thereon at the direction of a police officer or signal man, or of a signal or device for regulating traffic, shall be punished by a fine of not more than fifty dollars.").

  b. A law against disorderly conduct. *See* Mass. Gen. Laws ch. 272, § 53(b) ("Disorderly persons and disturbers of the peace, for the first offense, shall be

punished by a fine of not more than $150. On a second or subsequent offense, such person shall be punished by imprisonment in a jail or house of correction for not more than 6 months, or by a fine of not more than $200, or by both such fine and imprisonment"); *see also Alegata v. Commonwealth*, 353 Mass. 287, 304 (1967) (disorderly person is one who "with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . (a) engages in fighting or threatening, or in violent or tumultuous behavior; or (b) makes unreasonable noise or offensively coarse utterance, gesture or display, or addresses abusive language to any person present; or (c) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.").

 c. A law against assault and battery. *See* Mass. Gen. Laws ch. 265 § 13A(a) ("Whoever commits an assault or an assault and battery upon another shall be punished by imprisonment for not more than 2 ½ years in a house of correction or by a fine of not more than $1,000.").

 d. A law against trespass. *See* Mass. Gen. Laws ch. 266, § 120  ("Whoever, without right enters or remains in or upon the dwelling house, buildings, boats or improved or enclosed land, wharf, or pier of another, or enters or remains in a school bus, as defined in section 1 of chapter 90, after having been forbidden so to do by the person who has lawful control of said premises, whether directly or by notice posted thereon, or in violation of a court order pursuant to section thirty-four B of chapter two hundred and eight or section three or four of chapter two hundred and nine A, shall be punished by a fine of not more than one hundred dollars or by imprisonment for not more than thirty days or both such fine and imprisonment.").

 e. A law against the obstruction of streets, sidewalks, and crosswalks. *See* Worcester, Mass., Rev. Ordinances ch. 12, § 25(b) ("No person shall stand, or place any obstruction of any kind, upon any street, sidewalk or crosswalk in such a manner as to obstruct a free passage for travelers thereon.").

 Over the next several years, the City Council continued to request updates on incidence of panhandling within the City.  In March 2010, the City Council also asked the City Solicitor to report on "options for addressing the distinction between a panhandler, groups collecting funds with tag permits, and groups without permits."

 In a July 17, 2012, report to the City Council, the City Manager indicated that while those panhandling were not necessarily homeless, there was a desire in the City to connect panhandlers with resources in the community: housing, medical services, food, etc.  Drafts of the ordinances now under scrutiny were then proposed by the City Manager to the City Council as part of "a

multi-faceted, community-wide response" involving a "mix of education, outreach, and enforcement" to reduce public safety issues in relation to aggressive panhandling and to ensure safer travel on the public ways, and in particular on City traffic islands and medians.  Part of this broad-based response involved implementing an outreach program where workers would make contact with those panhandling in order to assess their needs and to connect the individuals with community-based resources. The City had previously engaged in "discussions regarding the implementation of a strategy to reduce the incidence of panhandling" within City limits. The City Manager submitted a letter from the City Solicitor, David M. Moore ("City Solicitor") which opined that "the [C]ity cannot legally prohibit peaceful panhandling that does not interfere with the movement of traffic or otherwise endanger public safety." The City Solicitor noted, however, that "certain methods of panhandling . . . are currently regulated by state law," including laws against "disorderly conduct, trespass, and assault."

In the July 17, 2012 report, the City Manager described "passive" and "aggressive" panhandling as follows:

> Panhandling—or approaching pedestrians or drivers to beg for money or food—may be classified as either passive or aggressive. Passive panhandling is defined as "soliciting without threat or menace, often without any word exchanged, while aggressive panhandling is defined as soliciting coercively, with actual or implied threats, or menacing actions."

"Peaceful panhandling" was further described as "constitutionally protected speech under the First Amendment to the U.S. Constitution."  The report also noted that  "[w]hile peaceful begging is a protected activity, if the person's conduct transgresses those peaceful limits there are other State statutes that deal with such behavior," which include laws prohibiting "trespass (i.e., private property/businesses), assault and battery, disorderly conduct (so long as that conduct is tumultuous), and G.L. c. 85, § 17A."  These laws remain in effect in

Massachusetts and therefore, are available to prohibit the obstruction of traffic, prevent signaling, stopping, or accosting occupants of motor vehicles, or address other aggressive solicitation. The City Manager further reported that "Worcester Police were dispatched to 181 incidents between January 2011 and January 2012 in which there were reports of aggressive behavior by an individual who may have been involved in panhandling."

On October 30, 2012, the City Manager reported to the City Council about the City's non-legislative efforts to address the panhandling situation.  Those efforts included employing outreach workers to discover reasons for panhandling so that a determination could be made as to what resources were needed and to connect those needing assistance with social service agencies.   The City Manager noted that of the thirty-eight panhandlers that had been engaged by the outreach workers, sixteen individuals reported to be homeless, twenty had a history of mental health issues and approximately seventy-five percent had substance abuse issues.  A majority of those individuals did express a desire to work with an outreach worker to obtain assistance. The City Manager proposed two ordinances for the City Council's consideration, both of which were intended to address the incidence of panhandling within the City:  R.O. ch. 9, § 16, "an ordinance prohibiting aggressive begging, soliciting and panhandling in public places," and R.O. ch.13, § 77(a), "an ordinance relative to pedestrian safety."   The City Council the requested opinions on the constitutionality of granting exemptions to certain speakers, such as nonprofit groups soliciting charitable donations.  Of specific concern was the potential impact of the proposed ordinances on "Tag Days."  Prior to the adoption of the Ordinances, nonprofit groups and organizations could apply to the City for permits allowing them to stand on traffic islands and "go out in the street" to solicit donations in public on a particular day. "Tag Day" fundraising efforts took place in the City for many years prior to the enactment of the Ordinances. Neither

side cites to any reports that soliciting from motorists during Tag Days has resulted in any accidents or injury in the City.  The City Council requested that the City Solicitor give an opinion on whether the "inclusion of a separate category of tag sales [sic] would impact on the constitutionality of controlling panhandling," as well as "whether it is legal to separate non-profit groups from panhandlers."  In response to the City Council's request, the City Solicitor advised on November 7, 2012: "Allowing tag day solicitations while banning other solicitations would create a distinction based on the content of the speech or the nature of the speaker. This distinction would not survive scrutiny under the Constitution."

On November 13, 2012, the City Council requested further clarification from the City Solicitor regarding "whether the City Council would be able to waive the enforcement [of the Ordinances] to allow Social Service Agencies, Charitable Groups and baseball teams to conduct tag days" and to further report "any impact there would be if it was decided to have a waiver built into a Panhandling Ordinance."  The City Solicitor did not respond to this request.  At the January 3, 2013 City Council meeting, the question was asked as to whether there was "any way to pass these ordinances without them impacting Tag Days, for example."  Councilors also inquired whether it would be possible to campaign from highly visible traffic islands if proposed R.O. ch.13, § 77(a) passed, "[f]or instance, [as] a political candidate standing in the middle of Newton Square or Lincoln Square." The City Solicitor responded to the City Council by stating that "there is an element of discretion introduced into the ordinance for the police officers to identify a problem with public safety or not, and if there is no problem with public safety, they would not tell anyone [on a traffic island], obviously, to move along."  On January 29, 2013, the ordinances proposed by the City Manager were adopted as Ordinance 9-16 and Ordinance 13-77.

The Ordinances, as adopted, were identical to the draft ordinances proposed by the City Manager in October 2012.

<u>*Why the Ordinances were Enacted*</u>

The City has acknowledged that "for the most part" police were able to address complaints of aggressive panhandling prior to adoption of the Ordinances.  In adopting the Ordinances, the City Council relied on the City Manager's July 17, 2012 representation that 181 incidents of aggressive panhandling had been reported to the Worcester Police between January 2011 and January 2012— the vast majority of which occurred on private properties, such as convenience stores and gas stations.  Although the City Manager's July 17, 2012 report describes 181 incidents occurring from January 2011 to January 2012, the records the City has produced include reports of 196 calls received during that time period, coded "PAN" (for "Panhandlers"). The City did not include incidents that did not appear to be related to panhandling. The City identified these incidents by extracting data "from a query that was generated [using] key words such as panhandling, begging, [and] soliciting."  Some of the incidents do not explicitly describe acts of solicitation or a person being present in the traveled portion of the roadway or on a traffic island. The records the City referenced during this time include incidents which would not constitute "aggressive" solicitation under Ordinance 9-16, or conduct now prohibited by Ordinance 13-77. For example, even though it bears the code DIP indicating "Disorderly Person," Incident No. 11/018893 indicates only a "report of a [white male] brown jacket, jeans, white sneakers and a hat panhandling outside" a Walgreens drug store and that an employee requested "him to be moved along."  Incident No. 11/030920 describes a call from a 7/11 reporting a "[black male] 5'5 wearing a jean jacket and jeans outside the store begging customers for money."   The majority of solicitation occurred on a set of "major" "desired intersections."

Significantly, the City did not consider prohibiting panhandling only at specified major intersections.

The City was also concerned about the "undue influence and/or fear" caused by solicitation within 20 feet of the areas specified Ordinance 9-16 and therefore, enacted the 20 foot buffer zones. The City Manager testified in support of the buffer zone as follows:

> The situation, I think, is defined where being solicited in those situations where you're handling money, working to properly operate an ATM, working close to check cashing businesses where you're coming out with cash in your hands, that within that 20 feet, there would certainly be the potential for improper undue influence. It's that close. It's an immediate situation where having that engagement certainly could produce fear or – fear of coercion. And so 20-foot became what I would consider to be a reasonable distance for people to be able to engage in these types of activities without being coerced or put under improper or undue influence.

The City Manager could not provide any justification for the City's determination that 20 feet, rather than a smaller distance, was necessary to achieve its goals.  Furthermore, Ordinance 9-16 prohibits all solicitation within 20 feet of any of the locations described therein, regardless of whether a solicitor intends to cause or is causing undue influence or fear. The City agreed that individuals are not necessarily "aggressive" if they are "selling T-shirts" "within 20 feet of a theater," "selling cookies" or "hotdog[s]" "within 20 feet of the entrance to a place of public assembly," or "holding a sign" seeking aid "within 20 feet of an outdoor seating area," yet all such activities are precluded by Ordinance 9-16.

The City acknowledges that not all solicitations within 20 feet of a designated location poses a public safety risk. For example, standing with a sign is an example of "passive" panhandling and is only aggressive if "coupled with other conduct that would potentially create a hazardous situation for motorists, pedestrians," such as "obstruct[ing] traffic."  Without "another overt act of aggression," such passive solicitation within the 20-foot buffer zones does

10

not pose a problem or implicate any safety interest.  However, Ordinance 9-16 bars "passive" panhandling in the 20-foot buffer zone even if the panhandler does not engage in aggressive conduct. The City asserts that "imped[ing] access and egress" to the areas delineated in Ordinance 9-16 establishes an appropriate safety justification for prohibiting solicitation within 20 feet of these areas.  For example, the City has an interest in preventing solicitors "from interfer[ing] with egress or ingress" to ATMs, theatres, mass transit stops or facilities because a person seeking donations may block the entrance or exit, creating an unwilling, "captive audience."  However, the Ordinances do not prevent parties from "impeding access and egress" to the designated areas if they are *not* seeking an immediate donation of money or another thing of value, or offering to immediately exchange and/or sell any goods or services.  For example, a person may engage in political advocacy near any of the designated areas or even lurk near an ATM for an extended period of time engaging in conversation with people entering and exiting," without violating Ordinance 9-16. Ordinance 9-16 also prohibits any solicitation from one half-hour before until one half hour after dark, regardless of whether that solicitation inspires alarm and fear, or whether it occurs in well-lit areas. The City enacted a categorical approach against solicitation during these time periods because it believed it would be too difficult to enforce a more targeted prohibition that focused on areas that are not well-lit.  The City also acknowledges that solicitation at night is not, "[i]n and of itself," an aggressive act; rather, night-time solicitation is aggressive only if the solicitor also engages in further aggressive behavior.

As to Ordinance 13-77, the City has asserted that the "fear of someone being hurt and/or injured" drove its adoption, although it was unaware of any accidents or injuries caused by speech-related activities on City traffic islands.  None of the witnesses who testified for the City was aware of any accidents or injuries caused by speech-related activities on traffic islands

within City limits, nor was any witness aware of any calls or complaints made to police in response to people engaged in political campaigning or political issue advocacy from traffic islands. The City Manager testified at his deposition that about the safety interest in drafting Ordinance 13-77:

> A. Both tag days, as well as panhandling that had come off the public sidewalk and began to proliferate within the public way gave great rise to fear of someone being hurt and/or injured. And in this day and age of distracted driving being more – probably the most prevalent in our history, it was time to address it. Failing that, there was going to be a tragedy. And one tragedy would have been one tragedy too many.
>
> Q. Was there any particular incident that drove the drafting and the passing of the ordinance?
>
> A. It was the preponderance of incidents where complaints came in that tag days were walking the white lines of a divided street, where traffic signals were ignored, where aggressive panhandling, people that were unfortunately and horribly had physical challenges were trying to maneuver and negotiate between moving cars on the white lines, people that were standing unsteadily, soliciting on small islands meant to guide traffic, not meant to be a plaza or place to gather or stand. …

As to whether existing laws were sufficient to address the concerns raised by the City Council, the City, through a police department witness testified that "the activity associated with aggressive panhandling didn't always fall squarely into an existing statute," and although there are laws that pertain to trespassing and disorderly conduct for instance, they could be difficult to enforce in a panhandling situation where "just the right circumstances had to give rise for charges to be imposed."

*The Ordinances*

*Ordinance 9-16*

The preamble to Ordinance 9-16 provides in relevant part, as follows:

(a) *Declaration of Findings and Policy.*

The city of Worcester, acting by and through its City Council, hereby makes the following findings:

(1) The City of Worcester has a duty to protect the rights of all people to exercise their First Amendment rights safely. The City of Worcester has a compelling governmental interest in imposing certain reasonable time, place and manner regulations whenever potential First Amendment activities such as begging, solicitation and panhandling occur on streets, highways, sidewalks, walkways, plazas, and other public venues within the City;

(2) This ordinance is not intended to limit any persons from exercising their constitutional right to solicit funds, picket, protest or engage in constitutionally protected activities. The provisions of this division are expressly established to most narrowly tailor any such restrictions to protect the First Amendment rights of all people within the City as well as the rights of non-participating people and their property, and to ensure the rights and safety of all people and/or property to the extent possible;

(3) Persons approached by individuals asking for money, objects or other things of any value are particularly vulnerable to real, apparent or perceived coercion when such request is accompanied by or immediately followed or preceded with aggressive behavior … .

(4) The City desires to respect a person's potential right to solicit, beg or panhandle while simultaneously protecting another's right to not be unduly coerced.

(5) The City further finds that aggressive soliciting, begging or panhandling of persons within 20 feet of any outdoor seating area of any cafe, restaurant or other business, bank, automated teller machine, automated teller machine facility, check cashing business, mass transportation facility, mass transportation stop, or pay telephone also subjects people being solicited to improper and undue influence and/or fear and should not be allowed.

(6) Persons approaching other individuals in an aggressive manner asking for money, objects or other things of any value after dark in public places inspire alarm and fear, which coupled with the inherent difficulty of establishing identity should not be allowed.

(b) *Purpose and Intent.*

The public purpose of this ordinance is to protect the rights of all peoples to exercise their First Amendment rights as well as the people and/or property of those who chose to be non-participating.

*Id.*, at (a)-(b).

Ordinance 9-16 makes it "unlawful for any person to beg, panhandle or solicit any other person in an aggressive manner," and provides that "[a]ny police officer observing any person violating this provision may request or order such person to cease and desist in such behavior and may arrest such person if they fail to comply with such request or order."  The penalty for violating the ordinance is a fine of up to $50.00 "for each such day during which the violation is committed, continued or permitted, or that the Court may impose such community service as it shall determine in lieu of a monetary fine." *Id.*, at (d)-(e).

 For purposes of Ordinance 9-16, the operative terms are defined as follow:

"*Beg*," "*begging*," or "*panhandling*" shall be synonymous and shall mean asking for money or objects of value with the intention that the money or object be transferred at that time and at that place.

"*Solicit*" or "*Soliciting*" shall include using the spoken, written, or printed word, bodily gestures, signs, or other means of communication with the purpose of obtaining an immediate donation of money or other thing of value the same as begging or panhandling and also include the offer to immediately exchange and/or sell any goods or services.

"*Aggressive manner*" shall mean:

(1) approaching or speaking to a person or following a person before during or after soliciting if that conduct is intended or is likely to cause a reasonable person to fear bodily harm to oneself or to another, or damage to or loss of property or otherwise to be intimidated into giving money or other thing of value;

(2) continuing to solicit from a person after the person has given a negative response to such soliciting;

(3) intentionally touching or causing physical contact with another person or their property without that person's consent in the course of soliciting;

(4) intentionally blocking or interfering with the safe or free passage of a pedestrian or vehicle by any means, including unreasonably causing a pedestrian or vehicle operator to take evasive action to avoid physical contact;

(5) using violent or threatening language and/or gestures toward a person being solicited, or toward their property, which are likely to provoke an immediate violent reaction from the person being solicited;

 (6) following the person being solicited, with the intent of asking that person for money or other things of value;

(7) soliciting money from anyone who is waiting in line for tickets, for entry to a building or for any other purpose;

(8) soliciting in a manner with conduct, words or gestures intended or likely to cause a reasonable person to fear immediate bodily harm, danger or damage to or loss of property or otherwise be intimidated into giving money or any other thing of value;

(9) begging in a group of two or more persons in an intimidating fashion;

(10) soliciting any person within 20 feet of the entrance to or parking area of any bank, automated teller machine, automated teller machine facility, check cashing business, mass transportation facility, mass transportation stop, public restroom, pay telephone or theatre or place of public assembly, or of any outdoor seating area of any café, restaurant or other business;

(11) soliciting any person in public after dark, which shall mean the time from one-half hour before sunset to one-half hour after sunrise.

*"Public place"* shall mean a place to which the public has access, including, but not limited to: a place which a governmental entity has title, any street open to public use, bridge, sidewalk, walkway, driveway, parking lot, plaza, transportation facility, school, park, or playground, and the doorways and entrances to building and dwellings.

*Id.,* at (c).

### *Ordinance 13-77*

Ordinance 13-77 provides as follows:

(a) Pedestrians shall obey the directions of police officers directing traffic. Whenever there is an officer directing traffic, or whenever there is a traffic control signal within three hundred feet of a pedestrian, no such pedestrian shall cross a way or roadway except at such controlled location. Pedestrian crossings shall be made within the limits of marked crosswalk and as hereinafter provided. **No**

**person shall, after having been given due notice warning by a police officer, persist in walking or standing on any traffic island or upon the roadway of any street or highway, except for the purpose of crossing the roadway at an intersection or designated crosswalk or for the purpose of entering or exiting a vehicle at the curb or for some other lawful purpose. Any police officer observing any person violating this provision may request or order such person the remove themselves from such roadway or traffic island and may arrest such person if they fail to comply with such request or order. \***

(b) It shall be unlawful for any person to actuate a pedestrian control signal or to enter a crosswalk unless a crossing of the roadway is intended.

*Id.,* at (a)-(b) (emphasis in original).

For purposes of Ordinance 13-77, the operative terms are defined as follows:

*crosswalk* - that portion of a roadway ordinarily included within the prolongation or connection of curb lines and property lines at intersections, or any portion of a roadway clearly indicated for pedestrian crossing by lines on the road surface or by other markings or signs.

*roadway* - that portion of a street or highway between the regularly established curb lines or that part improved and intended to be used for vehicular traffic.

*traffic island* - **any area or space within a roadway which is set aside by the use of materials or paint for the purpose of separating or controlling the flow of traffic and which is not constructed or intended for use by vehicular traffic or by pedestrians, unless such area or space is marked or otherwise designated as a crosswalk.**

*See* R.O. ch. 13, §1 (emphasis in original).

<u>Enforcement of the Ordinances</u>

As of the date that the City filed its motion for summary judgment, there had been thirty

one arrests for violation of Ordinance 9-16.  Groups have continued to engage in expressive

activity on traffic islands and roadways in the City. For example:

a. On October 3, 2013, supporters of City Council candidate Frederick C. Rushton were observed standing with campaign signs on the Newton Square rotary.

b. On October 4, 2013, supporters of City Council candidate Peter Kush were observed standing with campaign signs on the Newton Square rotary.

     c. On October 17, 2013, supporters of City School Committee candidate Hilda Ramirez were observed standing with signs at that same location.

     d. On May 17, 2014, members of the Worcester Fire Department were observed standing on a traffic island to raise money for the Muscular Dystrophy Association of Massachusetts ("MDAM").

There is no evidence that the police were aware of any of these incidents, or that any of these incidents resulted in enforcement actions by the City or its police department.  In 2013-2014, there were 30 incidents involving persons who were arrested for allegedly violating the Ordinances. In 22 of the 29 incidents (75.9%), the suspect was charged with at least one other offense in addition to alleged violation of the Ordinances. These other offenses included trespassing, drug possession, disorderly conduct, and disturbing the peace.  Sixteen of the 29 arrests (55.2%) involved the same four individuals.

On February 25, 2015, Michael Gorham ("Gorham"), an individual known to exhibit frequent aggressive panhandling behavior was involved in a pedestrian accident. Gorham had been arrested nine times for aggressive panhandling, the most recent arrest occurring at about 2:00 p.m. on February 25, 2015, at the intersection of Chandler Street and Park Avenue in the City.  At approximately 11:45 p.m. that same day, Gorham was struck by a motor vehicle while he was in the middle of Chandler Street, and at the time of the filing of the City's motion was in critical condition (he has since died of his injuries).

<em>The Plaintiffs</em>

Thayer and Brownson are City residents. Thayer and Brownson are unemployed, and have been intermittently homeless for many years. They regularly stand in public areas in the City holding signs with messages asking passersby for help or money.  They rely on donations they receive to supplement income from Social Security, Social Security Disability Insurance, and the Supplemental Nutrition Assistance Program that they share.  Before the Ordinances were

17

enacted, Thayer and Brownson also stood on City traffic islands holding signs soliciting help. While soliciting, Thayer and Brownson do not step into the street to signal vehicles, and do not approach a vehicle unless the vehicle has stopped and an occupant indicates that s/he wishes to make a donation.  Since the passage of the Ordinances, Thayer has continued to hold a sign asking for aid on sidewalks in various locations throughout the City, including on the sidewalk at the corner of Park Avenue and Highland Street near the entrance to Elm Park, a place of public assembly under Ordinance 9-16.  Thayer sometimes stands in public, holding his sign as it begins to get dark. Since the passage of the Ordinances, Thayer has been told on multiple occasions to "get out" and cease solicitation on the sidewalk near the entrance to Elm Park by Worcester police officers.  After the passage of the Ordinances, while Thayer was holding his sign, police told him to stop soliciting, as there was "no more signing" allowed. More specifically, Thayer was told "we passed a new ordinance, there's no more signing in the City of Worcester." Thayer was also given written information by the police indicating that panhandling from traffic islands was now prohibited. Thayer no longer solicits from traffic islands, but would continue to do so if not for the Ordinances.

Since the passage of the Ordinances, Brownson has continued to stand in public areas in the City holding a sign asking for aid. Brownson sometimes stands in public, holding her sign, after dark as defined by Ordinance 9-16.   In order to avoid violating Ordinance 13-77, Brownson no longer solicits from traffic islands. If not for this ordinance, Brownson would continue to solicit from traffic islands within the City. Thayer and Brownson both agreed that walking back and forth into the street can be dangerous.  They also were familiar with Gorham, who had been arrested for aggressive panhandling.  They agreed that his "obnoxious" and

aggressive behavior warranted arrest, such as going out into traffic, and yelling at drivers, and Thayer stated, "I wouldn't want [him] coming up to my car."

Novick has been an elected member of the Worcester School Committee since 2009.  In biennial elections before the passage of Ordinance 13-77, Novick regularly campaigned on traffic islands and rotaries throughout the City,  along with many other local politicians. With the passage of Ordinance 13-77, Novick now fears that she would be fined or arrested if she were to campaign from traffic islands or median strips. If not for this ordinance, Novick would continue to campaign from traffic islands within the City. Novick and her supporters have held signs on sidewalks or other locations which do not violate Ordinance 13-77.

### Discussion

#### *What level of scrutiny to employ?*

Soliciting contributions is expressive activity that is protected by the First Amendment. In *Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 100 S.Ct. 826 (1980), the United States Supreme Court struck down an ordinance prohibiting solicitations by charitable organizations that did not use at least seventy-five per cent of their revenues for charitable purposes. The Court reaffirmed that "charitable appeals for funds, on the street or door to door, involve a variety of speech interests-communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes-that are within the protection of the First Amendment.... [S]olicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political or social issues, and ... without solicitation the flow of such information and advocacy would likely cease." *Id*. at 632, 100 S.Ct. 826; *see also United States v. Kokinda*, 497 U.S. 720, 725, 110 S.Ct. 3115 (1990)(solicitation is recognized form of speech protected by First

Amendment); *Benefit v. City of Cambridge*, 424 Mass. 918, 922-23, 679 N.E.2d 184, 187-88 (1997)(same).  Furthermore, it is black letter law that political speech of the type in which Ms. Novick seeks to engage, *i.e.,* she and her supporters holding up political signs and waving to passing motorists and pedestrians, is speech which is afforded the strongest protection under the First Amendment. *See Long Beach area Peace Newtwork v. City of Long Beach*, 574 F.3d 1011, 1021  (9th Cir. 2009)(political speech is core First Amendment speech critical to function of our democratic system).

        Because the activities in which the Plaintiffs seek to engage are protected speech, the Court's first task is to determine what level of judicial scrutiny to apply in this case.  "The Supreme Court has established different levels of scrutiny for analyzing alleged First Amendment violations, depending on where the speech takes place. In this case, the Plaintiffs seek to engage in free expression in areas which have been recognized as traditional public forums, *i.e.* city sidewalks, streets, traffic islands and medians. *See Cutting v. City of Portland*, -- F.3d--, No. 14-1421, 2015 WL 5306455 (1st Cir. Sept. 11, 2015). "In a traditional or designated public forum, content-neutral restrictions on the time, place, and manner of expression must be narrowly tailored to serve some substantial governmental interest, and must leave open adequate alternative channels of communication." *New England Re'l Council of Carpenters v. Kinton*, 284 F.3d 9, 20 (1st Cir. 2002).  Moreover, "viewpoint-based restrictions are prohibited, and any content-based restriction must satisfy strict scrutiny, but reasonable time, place, and manner limitations are permissible." *Watchtower Bible and Tract Soc. of New York, Inc. v. Sagardia De Jesus*, 634 F.3d 3, 11 (1st Cir. 2011).

### *Content-Based Versus Content-Neutral Speech*

        "The First Amendment, applicable to the States through the Fourteenth
Amendment, prohibits the enactment of laws 'abridging the freedom of speech'

… [A] government, including a municipal government vested with state authority, 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.' Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.

Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys. Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny.

[The Supreme Court] has also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be "'justified without reference to the content of the regulated speech,' " or that were adopted by the government 'because of disagreement with the message [the speech] conveys,' Those laws, like those that are content based on their face, must also satisfy strict scrutiny.

*Reed v. Town of Gilbert, Ariz.*, 573 U.S. ---, 135 S. Ct. 2218, 2226-27 (2015)(internal citations and citation to quoted authorities omitted).   Thus, strict scrutiny must apply if either the law is content based on its face, *or* the legislature's purpose or justification for enacting the law was content base: "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech … " '[i]llicit legislative intent is not the *sine qua non* of a violation of the First Amendment,' " and a party opposing the government "need adduce 'no evidence of an improper censorial motive.' Although 'a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary.' In other words, an innocuous justification cannot transform a facially content-based law into one that is content neutral." *Id.* at ----, 135 S. Ct. at 2228.  Thus, the Court must first determines whether the

law is content neutral on its face and thereafter, consider the purpose or justification behind its enactment. *Id.*

As to Ordinance 9-16, a protracted discussion of this issue is not warranted as substantially all of the Courts which have addressed similar laws since *Reed* have found them to be content based and therefore, subject to strict scrutiny[2]. *See Mclaughlin v. Lowell*, Civ.Act.No. 14-10270-DPW, -- F.Supp.3d--, 2015 WL 6453144 (D.Mass. Oct. 23, 2015); *Brown v. City of Grand Junction*, Civ.Act.No. 14-cv-00809-CMA-KLM, 2015 WL 5728755 (D.Col. Sep. 30, 2015), *see also Norton v. City of Springfield*, 612 Fed.Appx. 386 (7th Cir. 2015)(remanding to district court to enjoin city's anti-panhandling ordinance in light of *Reed's* mandate that such ordinances be deemed content based); *but see Watkins v. City of Arlington,* No. 4:14-CV-381-O, 2015 WL 4755523, at *1 (N.D. Tex. Aug. 12, 2015)(ordinance which regulates all interactions between pedestrians and the occupants of vehicles stopped at traffic lights is content neutral). Therefore, in order for Ordinance 9-16 to pass constitutional muster, the City must establish that it "'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Reed*, 135 S. Ct. at 2231 (citation to quoted case omitted).[3]  "This is an exacting standard.  Content based regulations are 'presumptively invalid,' and it is the 'rare case' in which strict scrutiny is

_____

[2] Simply put, *Reed* mandates a finding that Ordinance 9-16 is content based because it targets anyone seeking to engage in a specific type of speech, *i.e.*, solicitation of donations.

[3] As recently noted by another judge in this Court, in *McCullen* v. *Coakley*, 134 S.Ct. 2518, 2530, 189 (2014), the Supreme Court stated that in order to satisfy strict scrutiny, a law regulating speech "must be the least restrictive means of achieving a compelling state interest." *Mclaughlin*, 2015 WL 6453144, at *5 and n. 6 (quoting *McCullen*, -- U.S.. at --, 134 S.Ct. at 2530). The Supreme Court has sometimes used the two formulations interchangeably and has not made clear "precisely what those standards mean relative to each other. " *Id.*, at n. 6 (noting that the "narrowly tailored" standard is arguably more permissive).  Because the Ordinances in this case would not survive regardless of the formulation used (assuming there is a distinction in their application), it is not necessary for me to resolve this issue and like the Supreme Court, I will make no attempt to distinguish between the two.

overcome**."** *McLaughlin*, 2015 WL 6453144, at * 5 (internal citation and citation to quoted cases omitted).

As to Ordinance 13-77, the regulation on its face is content neutral as it does not regulate a particular type of speech, that is, it does not seek to restrict a particular view point, nor does it target a specific subject matter.  Looking next to the City's motivation, the City Council enacted the ordinance as the result of its "fear of someone being hurt and/or injured," *i.e.*, for public safety reasons.  Thus, the ordinance cannot be said to be content based because its adoption was motivated by the City's disagreement with any particular message being conveyed. *See generally Cutting*, -- F.3d at --, 2015 WL 5306455 at ** 3-4. Because Ordinance 13-77 regulates conduct deemed unsafe by the City in "an evenhanded content neutral manner," *see Reed*, 135 S.Ct. at 2223, I find that it is content neutral. In order for a content neutral ordinance to pass constitutional muster, it "must be narrowly tailored to serve the government's legitimate, content neutral interests but … need not be the least restrictive or least intrusive means of doing so… So long as the means chosen are not substantially broader than necessary to achieve the government's interest … the regulation will not be simply because a court concludes the government's interest could be adequately served by some less-speech-restrictive alternative". *Ward v. Rock Against Racism*, 491 U.S. 781, 798-800, 109 S.Ct. 2746 (1989).

<u>Whether Ordinance 9-16 Survives Strict Scrutiny</u>

To determine whether Ordinance 9-16 is constitutional, the Court must first determine the compelling governing interest at stake.  From the minutes of the City Council meetings, it is apparent that the primary concern of some councilors appeared to be that panhandling was a blight on the City which should be eliminated at all costs, while other councilors were clearly concerned with the safety and welfare of both those individuals engaged in solicitation as well as

members of the public being solicited. The preamble to the ordinance attempts to justify the legislative balancing of the right to exercise First Amendment freedoms, against the rights of the City to impose reasonable time, place, and manner restrictions on panhandling.  That preamble states that: "[p]ersons approached by individuals asking for money, objects or other things of any value are particularly vulnerable to real, apparent or perceived coercion when such request is accompanied by, or immediately followed or preceded with, aggressive behavior." *Ordinance 9-16*, at ¶ (a)(3). While this statement of purposes is somewhat self-serving, it does establish the ostensible reason for enacting the ordinance. It also is responsive to the City Manager's report that, from January 2011-January 2012, Worcester Police were dispatched to 181 incidents of aggressive behavior by individuals who may have been panhandling. Therefore, I find that the City's primary interest in enacting the ordinance was the safety and welfare of it citizens. As to Ordinance 13-77, the primary concern of the City Council appeared to be the safety and welfare of the public.

The City has a legitimate interest in promoting the safety and convenience of its citizens on public sidewalks and streets.  *See Madsen v. Women's Health Center*, 512 U.S. 753, 768, 114 S.Ct. 2516, (1994) ("State also has a strong interest in ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks ..."); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650, 101 S.Ct. 2559 (1981) (recognizing state interest in safety and convenience of citizens using public fora); *Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762 (1941) (recognizing state interest in safety and convenience on public roads); *Ayres v. City of Chicago*, 125 F.3d 1010, 1015 (7th Cir. 1997) ("There are unquestionable benefits from regulating peddling, First Amendment or otherwise, [including] … the control of congestion."); *see also McLaughlin*, 2015 WL 6453144 at *8(City of Lowell

enacted aggressive panhandling provisions in furtherance of public safety which is a compelling

state interest).  Therefore, the question becomes whether the provisions of Ordinance 9-16 are

narrowly tailored/least restrictive means available.

Before considering the other provisions, I will address Ordinance 9-16's temporal

solicitation ban which prohibits "soliciting any person in public after dark, which shall mean the

time from one-half hour before sunset to one-half hour after sunrise." *R.O.*, ch. 9, §16(e)(11).

Upon Plaintiffs filing an appeal of my denial of their motion for preliminary injunction, the First

Circuit duty panel entered an order temporarily enjoining enforcement of this provision.  The

panel that heard this case left the temporary restraining order in place after finding that the

implicit finding by the duty panel that this provision should be stricken as substantially

overbroad was "sound." *See Thayer*, 755 F.3d at n. 7. As to this provision, the City has not cited

to any evidence or provided any meaningful argument to establish that a "blanket prohibition on

panhandling at night is necessary to advance public safety." *Browne*, 2015 WL 5728755 at *12.

Therefore, the Court agrees with the Plaintiffs that this provision cannot stand.

If I were writing on a pristine page, I would be inclined to hold that at least some of the

other categories of proscribed conduct targeted by Ordinance 9-16 are sufficiently restrictive for

achieving the City's goal of promoting the safety and welfare of the public.  However, two recent

post-*Reed* decisions have addressed almost identical aggressive panhandling ordinances as those

addressed in this case. Both cases involved evidence similar to that relied on by the City in this

case[4] to justify enforcement of the aggressive panhandling provisions, and in both the courts

---

[4] The City has cited stronger evidence in this case than was cited in *Browne* or *McLaughlin* to support its contention that anti-aggressive panhandling ordinances such as Ordinance 9-16 promote a compelling government interest, *i.e.*, public safety.  However, the number of instances of aggressive panhandling cited by the City and the possibility that an individual known to aggressively panhandle *may* have been fatally struck by a motor vehicle while engaging in activity prohibited by the ordinance are insufficient to for the Court to find that Ordinance 9-16 withstands strict scrutiny.

found that the municipalities had failed to establish that similar provisions to the following

(defined by Ordinance 9-16 to constitute "aggressive" panhandling) survived strict scrutiny.

Their failure was because they were duplicative of existing criminal laws and/or they were not

the least restrictive means of achieving the government's goal [5]:

>(1) continuing to solicit from a person after the person has given a negative response to such soliciting;
>
>(2) following the person being solicited, with the intent of asking that person for money or other things of value;
>
>(3) soliciting money from anyone who is waiting in line for tickets, for entry to a building or for any other purpose; and
>
>(4) soliciting any person within 20 feet of the entrance to or parking area of any bank, automated teller machine, automated teller machine facility, check cashing business, mass transportation facility, mass transportation stop, public restroom, pay telephone or theatre or place of public assembly, or of any outdoor seating area of any café, restaurant or other business.

*See McLaughlin*, 2015 WL 6453144; *Browne,* 2015 WL 5728755 (challenged provisions of

ordinance are over inclusive because they prohibit protected speech that poses no threat to public

safety).

Additionally, in *McLaughlin*, Judge Woodlock of this Court, again on a record that

mirrors this case, applying that same reasoning found restrictions on panhandling identical to the

following provisions contained in Ordinance 9-16 to be unconstitutional[6]:

>(1) approaching or speaking to a person or following a person before during or after soliciting if that conduct is intended or is likely to cause a reasonable person to fear bodily harm to oneself or to another, or damage to or loss of property or otherwise to be intimidated into giving money or other thing of value;

---

[5] Because, for example, existing laws are sufficient to address the targeted behavior, or because the prohibited conduct, which constitutes protected expression, is not necessarily intimidating or menacing and therefore, does not constitute a threat to public safety.

[6] The ordinance at issue in the Browne case contained similar provisions, however, the plaintiffs in that case did not challenge any of the provisions which prohibited the panhandler from engaging in conduct that is threatening, coercive, obscene or causes a person to reasonably fear for his/her safety.

(2) using violent or threatening language and/or gestures toward a person being solicited, or toward their property, which are likely to provoke an immediate violent reaction from the person being solicited;

(3) intentionally blocking or interfering with the safe or free passage of a pedestrian or vehicle by any means, including unreasonably causing a pedestrian or vehicle operator to take evasive action to avoid physical contact;

(4) soliciting in a manner with conduct, words or gestures intended or likely to cause a reasonable person to fear immediate bodily harm, danger or damage to or loss of property or otherwise be intimidated into giving money or any other thing of value; and

(5) begging in a group of two or more persons in an intimidating fashion.

*McLaughlin*, 2015 WL 6453144, at **8-11.  There is no point in engaging a protracted discussion that in the end will parrot, *albeit* with nuances immaterial to the outcome, the comprehensive analyses of the *Browne* and *McLaughlin* opinions.  Suffice to say that for the same reasons adopted by those courts, I find that the entirety of Ordinance 9-16 fails because it is not the least restrictive means available to protect the public and therefore, does not satisfy strict scrutiny.  While I find that none of the provisions of Ordinance 9-16 can withstand strict scrutiny as written, the City and other municipalities have raised some legitimate concerns regarding aggressive panhandlers and public safety.  Post *Reed*, municipalities must go back to the drafting board and craft solutions which recognize an individuals to continue to solicit in accordance with their rights under the First Amendment, while at the same time, ensuring that their conduct does not threaten their own safety, or that of those being solicited. In doing so, they must define with particularity the threat to public safety they seek to address, and then enact laws that precisely and narrowly restrict *only* that conduct which would constitute such a threat.

_Whether Ordinance 13-77 Is Narrowly Tailored to Achieve A Compelling Government Interest_

In determining the constitutionality of Ordinances 13-77, once again, I am not writing on a pristine page.  In a recent decision, the First Circuit addressed the constitutionality of a similar ordinance enacted in Portland, Maine[7].  As to that ordinance, the First Circuit noted that it "imposes 'serious burdens' on speech" and because it prohibits "virtually all activity on median strips  an thus all speech on median strips… it is hard to imagine a median strip ordinance that could ban more speech."[8]. In terms of whether the ordinance was narrowly tailored, the First Circuit noted that the Portland ordinance restricted speech from all median strips throughout Portland, regardless of their size and character— considerations such as pedestrian and vehicular traffic patterns were not given any weight.   The First Circuit went on to hold that neither the City of Portland's "interest in protecting people in the streets nor its interest in protecting people in the medians hold on medians holds up as a justification for the ordinance." _Cutting_, -- F.3d at --, 2015 WL 5306455, at *7.  More specifically, the court found that "[t]he ordinance is … geographically over-inclusive with respect to the City [of Portland] 's concern that people lingering in all of [its] median strips—no matter which ones—pose a danger to those passing by." _Id._  Ordinance 13-77 suffers from the same infirmities. The City can point to specific medians and traffic islands as to which a pedestrian use should be prohibited in the interest of public safety (the traffic islands and/or medians in Kelly, Newton and Washington Squares come to mind).  However, on this record, it has not established the need for the "sweeping ban … it

---

[7] The Portland ordinance provided that: "No person shall stand, sit, stay, drive or park on a median strip ... except that pedestrians may use median strips only in the course of crossing from one side of the street to the other." Portland City Code §25-16(b); _Cutting v. City of Portland, Maine_, -- F.3d--, No. 14-1421, 2015 WL 5306455, at *1 (1st Cir. Sept. 11, 2015).

[8] While the Portland ordinance is limited to medians, Ordinance 13-77 also bans all such activity on traffic islands and in roadways.

chose." *Cutting,*-- F.3d at --, 2015 WL 5306455, at *10  " 'In short, the City has not shown that it seriously undertook to address the problem with less intrusive tools readily available to it.' Instead, it 'sacrific[ed] speech for efficiency,' and, in doing so, failed to observe the 'close fit between ends and means' that narrow tailoring demands." *Id.* (internal citation and citation to quoted case omitted).[9]

Given that I have found that the Ordinances must be stricken on the grounds that they unconstitutionally restrict speech, it is not necessary for me to address the Plaintiffs other legal challenges.

## Conclusion

IT IS HEREBY ORDERED that:

1. the City of Worcester's Motion for Summary Judgment (Docket No. 79) is ***denied***; and

2. the Plaintiffs' Motion for Summary Judgment (Docket No. 82) is ***granted*** as follows[10]:

---

[9] Rather than regurgitate the First Circuit's entire opinion in *Cutting*, I will make the following brief observations. First, the court identified several other ways in which the Portland ordinance was not narrowly tailored to meet a compelling government interest.  Based on the record before me, the City has provided even less evidence and/or justification for the blanket ban on speech imposed by Ordinance 13-77 and therefore, most, if not all, of those same deficiencies exist with respect thereto.  Additionally, the First Circuit provided a detailed road map as to how the City can modify Ordinance 13-77 to address pedestrian safety concerns by other, "less speech restrictive means"-- while it again means going back to the drawing board, the opinion makes clear that this is an area that the City can regulate but that to do so will require it to essentially target specific traffic islands and medians based on location and pedestrian and vehicular traffic patterns.

[10] "No permanent injunction is required in this case. Massachusetts assumes that its municipalities will 'do their duty when disputed questions have been finally adjudicated' and can 'rightly be expected to set an example of obedience to law.'" *Mclaughlin,* 2015 WL 6453144, at *12 (citation to quote case omitted).

a. The City of Worcester Revised Ordinances of 2008, as amended through September 1, 2015[11], ch. 9, § 16 (Aggressive Begging, Soliciting and Panhandling) is unconstitutional in its entirety; and

b.   The following provision contained in City of Worcester Revised Ordinances of 2008, as amended through September 1, 2015, ch. 13, § 77(a)(Crossing Ways or Roadways) is unconstitutional:

**No person shall, after having been given due notice warning by a police officer, persist in walking or standing on any traffic island or upon the roadway of any street or highway, except for the purpose of crossing the roadway at an intersection or designated crosswalk or for the purpose of entering or exiting a vehicle at the curb or for some other lawful purpose. Any police officer observing any person violating this provision may request or order such person the remove themselves from such roadway or traffic island and may arrest such person if they fail to comply with such request or order.**

**/s/ Timothy S. Hillman**
TIMOTHY S. HILLMAN
DISTRICT JUDGE

---

[11] At the time that this suit was filed, the amendments to the City of Worcester Revised Ordinances ran through February 5, 2013.  The City of Worcester Revised Ordinances have further been amended as of September 1, 2015, however, the provisions at issue in this case remain unchanged in the most recent version.